In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3909

CARLETOS E. HARDAMON,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 628—**Michael J. Reagan**, *Judge.*

ARGUED DECEMBER 9, 2002—DECIDED FEBRUARY 14, 2003

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* After a jury found Petitioner Carletos E. Hardamon guilty of conspiracy to distribute cocaine base, the district court sentenced him to life in prison and we affirmed his conviction and sentence in *United States v. Hardamon*, 188 F.3d 843 (7th Cir. 1999). Attorney Russell Prince Arnold represented Hardamon at trial and at the sentencing hearing, but not on appeal. Following his direct appeal, Hardamon filed a petition for writ of habeas corpus alleging ineffective assistance of trial counsel and arguing that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), applies retroactively on collateral review. The district court denied the writ but granted a Certificate of Appealability with respect to the ineffective

assistance claim. This Court later issued a Certificate of Appealability regarding the *Apprendi* claim. For the following reasons, we affirm the district court's denial of the writ of habeas corpus.

## BACKGROUND

Because Hardamon's ineffective assistance of counsel claim involves primarily testimony elicited from certain government and defense witnesses, a recitation of relevant statements made by those witnesses on direct and cross-examination follows.

### A. The Government's Witnesses

### 1. Joseph Trotter

Joseph Trotter was a cooperating co-defendant who testified that he made several trips with Hardamon in 1996 from Alton, Illinois, to Chicago in order to obtain crack cocaine for sale in Alton. On one trip, Trotter received $10,000 worth of crack from Hardamon, and Hardamon instructed Trotter to wire the money from the sale to Theodora Overton, another co-defendant. Trotter further testified that Hardamon made at least three trips to Alton to deliver and sell drugs out of Trotter's apartment.

During his testimony, Trotter made several statements to which Hardamon's counsel did not object. First, Trotter testified that he thought Overton "phoned either CJ or Charles Media" claiming that she was calling her supplier for more drugs; "CJ" was the alias Hardamon used in Alton. This testimony was later corroborated by Overton's testimony. Trotter also stated that Hardamon planned to discuss Overton's greediness with her and that Hardamon said he would "take care of it." Trotter's subsequent testimony that Hardamon did in fact talk with

Overton was based only on Trotter's knowledge that Hardamon planned to talk with her.

Under cross-examination by Hardamon's attorney, Trotter admitted that he spent seventeen of the last nineteen years in prison. He also acknowledged that if he did not cooperate with the government he could receive a life sentence; as a result of cooperating, he hoped to be sentenced to as few as nine years. Trotter further stated that he supplied drugs to another government witness, Gina Blackmon, and that he lied to police about his involvement in a drug-related shooting. Finally, Hardamon's attorney elicited admissions from Trotter that parts of his testimony regarding amounts of money he gave to Hardamon and amounts Trotter made from dealing drugs may have been inaccurate.

Not all of Trotter's cross-examination, however, was beneficial to Hardamon's case; some questioning by Hardamon's attorney produced damaging evidence. Trotter volunteered on cross-examination that Hardamon had similar drug activities underway in Decatur, Illinois, on the same night Trotter was arrested. Hardamon's counsel also asked Trotter if Hardamon had come to Alton prior to October 1996 and Trotter stated that Hardamon came once before that date "to check out the layout . . . see how profitable it was."

### 2. Charles Media

Cooperating co-defendant Charles Media testified on direct examination that he drove Hardamon from Chicago to Alton on one occasion and that Hardamon brought two or three ounces of crack to sell in Trotter's apartment on that trip. Media also testified that on occasion he saw Hardamon supply co-defendants Trotter and Overton with cocaine to sell in Alton and that he saw Hardamon accept merchandise in return for cocaine. Media further

recalled Hardamon saying that drugs seized from Trotter's apartment in a police raid belonged to him.

On cross-examination, Media admitted to using several aliases and fictitious birth dates throughout his adult life. He also testified that Trotter had been obtaining drugs from another supplier before meeting Hardamon. Media revealed little information to police about his own suppliers but admitted that Trotter provided him with prostitutes. Finally, Media admitted he was willing to accept more money from Trotter than Trotter owed him but denied trying to extort Trotter.

### 3. Gina Blackmon

Gina Blackmon testified that she sold drugs for Hardamon and that the two had a romantic relationship from time to time. On one occasion, Trotter gave her $1000 in drug proceeds to deliver to Hardamon in Chicago. Blackmon also testified to statements Hardamon made that reflected his control over two sellers, known as "Tone" and "Echo," and that he "would take care of them" if they ever tried to take over. Finally, Blackmon testified on direct examination, without objection, that she told police Hardamon was one of Trotter's main drug suppliers, basing this knowledge on statements made by Overton.

On cross-examination, Hardamon's attorney elicited testimony about Trotter's use of teenagers to sell drugs and about an occasion when she hid a gun that Trotter had used in a shooting. Blackmon also admitted that she believed Charles Media, another government witness, "killed some people and got off easy." When asked, however, if she had ever seen Hardamon with a controlled substance, Blackmon testified that she had. This testimony allowed the prosecution to introduce further testimony from Blackmon about a specific instance when

she saw Hardamon with crack cocaine. Finally, Hardamon's attorney attempted to discredit Blackmon's testimony by establishing that the government gave her immunity from prosecution and that she had never actually seen Hardamon sell drugs.

### 4. Richard Smith

Richard Smith admitted on direct examination to heavy drug use and to accompanying Trotter on drug runs to Chicago. On those trips, Smith saw Hardamon supply Trotter with drugs and witnessed Trotter pay Hardamon for the drugs with cash and merchandise, such as small electronic items, that Trotter had received from drug sales in Alton. As with previous witnesses, Smith's testimony included statements to which Hardamon's attorney did not object. For example, Smith testified that he knew Hardamon was supplying Trotter with drugs "because [Smith] was present and [through] word of mouth." He also stated that he saw Hardamon involved in a drug transaction on a particular occasion because it was his "understanding that was the only purpose of [Hardamon] being there." Finally, Smith testified, without objection, that Hardamon "was doing the same types of things in Decatur that he was doing in Alton."

On cross-examination, however, Smith testified that he saw Charles Media supply "Tone" and "Echo" with drugs and that he feared Media might kill him. Smith acknowledged that he saw Media, but not Hardamon, trade crack for guns, and he also testified that he saw Hardamon delivering drugs in Alton. Finally, Smith admitted that he received immunity for his testimony and that Joseph Trotter had local drug sources long before Trotter met Hardamon.

### 5. Theodora Overton

Cooperating co-defendant Theodora Overton testified on direct examination that on four separate occasions Hardamon supplied her with as much as five ounces of drugs to sell. She also testified that Hardamon made at least six trips to Alton in order to sell drugs himself. Without objection, Overton further stated that she believed Hardamon had been dealing drugs for nine or ten years in Chicago prior to doing so in Alton in 1996.

Hardamon's attorney, however, brought out the admission that she would have been facing life in prison absent her cooperation with the government, but because of her cooperation, she hoped for a prison sentence of eighteen years. Overton also admitted to having drug suppliers prior to meeting Hardamon and that she started working with him in September or October 1996, and not nine years earlier as she testified on direct examination. Finally, Overton admitted that Hardamon supplied her with drugs on only two of the four trips mentioned above and that, short of her dealings with him, her knowledge of Hardamon's drug activity came from street conversations.

### B. Hardamon's Witnesses

During Hardamon's case-in-chief, defense counsel called four police witnesses to the stand; two of which are relevant to this appeal. First, DEA Special Agent Ralph Moore testified that he did not mention Hardamon as one of Trotter's drug suppliers or mention Hardamon moving cocaine from Chicago to Alton when testifying before the grand jury. Moore also admitted that witnesses interviewed by police were unable to establish specific dates for Hardamon's trips to Alton, but that police believed Hardamon brought five ounces of crack to Alton from Chicago on December 29, 1996. Moore further testified that Hardamon "had been convicted of crack co-

caine" in Decatur; defense counsel's objection to this testimony was overruled.

Second, DEA Special Agent Paul Robinson admitted that, prior to Trotter's arrest, police reports did not link Hardamon to drug dealing in Alton and that Trotter was the first to identify Hardamon as a "big dealer." Defense counsel's questioning about how police concluded Hardamon's alias was "CJ," however, later allowed the prosecution to introduce the actual mug shot line-up shown to witnesses who identified Hardamon as "CJ." Each of the government's witnesses also made an in-court identification of Hardamon as "CJ."

### C. Defense Counsel's Conduct at Sentencing and His ARDC Status

After his conviction, a Presentence Investigation Report ("PSR") concluded that Hardamon was responsible for twenty ounces of crack cocaine, which he transported to Alton in September 1996, by relying on information from Theodora Overton. Hardamon's attorney made only general objections to this conclusion and did not call Overton to the stand to challenge her statements. After questioning defense counsel for failing to make specific objections, the district court adopted the determinations set out in the PSR and sentenced Hardamon to life in prison.

Finally, prior to the trial, the Supreme Court of Illinois had placed Hardamon's trial attorney on probationary status, pursuant to a petition filed by the Administrator of the Attorney Registration and Disciplinary Commission (ARDC). *In Re: Russell Prince Arnold*, IL Disp. Op. M.R. 12891 (Ill. Sup. Ct. 1996). Affidavits from Hardamon and his father state that Hardamon's attorney did not disclose his probationary status to Hardamon prior to trial.

**ANALYSIS**

We undertake a *de novo* review of a district court's legal conclusions on an ineffective assistance of counsel claim, while examining findings of fact for clear error. *United States v. Traeger*, 289 F.3d 461, 470 (7th Cir. 2002). To be successful on an ineffective assistance claim, Hardamon must: 1) show that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and 2) demonstrate a reasonable probability that this deficient performance affected the result of the trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Lindsay*, 157 F.3d 532, 534-35 (7th Cir. 1998).

Under the performance prong of the *Strickland* test, we consider counsel's performance in the context of the case as a whole, viewed at the time of the conduct, and maintain a strong presumption that the defendant received effective assistance. *Lindsay*, 157 F.3d at 534-35. To establish the requisite prejudice under the second prong of *Strickland*, the defendant must show a reasonable probability that, but for his attorney's performance, the result of the trial would have been different. *Traeger*, 289 F.3d at 470.

Hardamon argues that we should not apply the *Strickland* test but, instead, should apply the standard set forth in *United States v. Cronic* because his trial attorney failed to subject the government's case to meaningful adversarial testing. *See United States v. Cronic*, 466 U.S. 648, 654 n.11 (1984). This failure, Hardamon argues, resulted in the adversarial process becoming presumptively unreliable. We do not agree and find that the *Strickland* test governs Hardamon's claim.

Hardamon points to six specific instances in which his attorney's assistance was ineffective: 1) he failed to object to testimony on direct examination of government

witnesses; 2) he allowed evidence harmful to Hardamon's case to be admitted through his cross-examination of government witnesses; 3) his direct examination of defense witnesses further produced damaging evidence; 4) he failed to prepare adequately for and object at Hardamon's sentencing hearing; 5) he failed to investigate the case adequately; and 6) he failed to disclose that the Supreme Court of Illinois had placed him on probationary status prior to Hardamon's trial.

First, Hardamon argues that his attorney's failure to object during direct examination of government witnesses amounts to ineffective assistance. Specifically, Hardamon complains that his attorney did not object to testimony from Trotter about conversations Overton had with Hardamon, wherein Overton implicated Hardamon as her drug supplier. Similarly, Hardamon points to testimony from Blackmon and Smith that bolsters the fact that Hardamon was a drug supplier in Alton. He also argues that defense counsel failed to object to damaging testimony from Smith and Overton about Hardamon's prior bad acts, namely his drug activity in Decatur and how long Hardamon had been selling drugs in Chicago prior to doing so in Alton. Much of this testimony, even if objectionable as to one witness, eventually came in through other, unobjectionable means.

We find that defense counsel's decision to abstain from objecting to this testimony is reasonable. A competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would. *United States v. Payne*, 741 F.2d 887, 891 (7th Cir. 1984) ("A competent trial attorney might well eschew objecting . . . in order to minimize jury attention to the damaging material"). Further, as Hardamon conceded at oral argument, in certain cases where such testimony was given, an objection was not warranted because the prosecutor at-

tempted to correct or limit the witnesses' improper responses. Defense counsel's decision to limit objections to evidence concerning Hardamon's prior bad acts was, likewise, not unreasonable. Objecting to this evidence may further influence the jury negatively. *Id.* Defense counsel knew that similar testimony would be introduced later and chose not to call additional attention to the issue.

Second, Hardamon argues that his attorney's deficient performance appears in the cross-examination of government witnesses. Specifically, he claims that poor cross-examination by his attorney allowed for the admission of damaging evidence that would not have been admitted otherwise. As examples, Hardamon points to Trotter's testimony regarding Hardamon's drug sales in Decatur and Alton and testimony concerning Hardamon's first appearance in Alton as well as testimony from Blackmon and Smith about seeing Hardamon with a controlled substance. Again, it is hard to find defense counsel's performance deficient in these situations. Often an attorney must take risks on cross-examination, and when hostile witnesses are involved, these risks may backfire. Such risk taking, however, does not necessarily amount to ineffective assistance.

Furthermore, we find that Hardamon's attorney effectively attacked the credibility of several witness on cross-examination, a point which Hardamon also conceded at oral argument. As a whole, he elicited admissions that witnesses expected drastic sentence reductions for cooperating, were drug addicts or dealers, had cheated people in the past, had been involved in drug-related shootings, had spent significant amounts of time in prison, and had lied to police during investigations. He also established doubt about witnesses' certainty of specific dates Hardamon was alleged to have been selling drugs in Alton. That the jury ultimately believed the cumulative testimony of

multiple government witnesses is not for this Court to contradict. *United States v. Algee*, 309 F.3d 1011, 1016 (7th Cir. 2002) ("Credibility determinations, however, are within the province of the jury, and we will not reverse them just because the credited testimony comes from confessed law-breakers or known liars.").

Third, Hardamon claims that trial counsel's handling of witnesses during Hardamon's case-in-chief further demonstrates his unreasonable performance. In this regard, Hardamon urges that the direct examination of DEA Agents Moore and Robinson allowed damaging evidence to be admitted. As in previous instances, we find that defense counsel performed reasonably at this stage. Counsel established that police could not get consistent dates from witnesses about Hardamon's activities in Alton and that such witnesses also deeply implicated themselves in statements to police concerning Hardamon's activities.

Agent Moore's testimony regarding Hardamon's drug activities in Decatur, while prejudicial to Hardamon's case, was not admitted into evidence as a result of poor trial work by defense counsel. In fact, Hardamon's attorney objected to this statement, but was overruled. The admissibility of the statement was an issue for direct appeal, which Hardamon has exhausted, and it does not indicate ineffective assistance of counsel. Nor does defense counsel's questioning of Agent Moore, which led to testimony regarding five ounces of crack cocaine police believed Hardamon brought to Alton on December 29, 1996, amount to unreasonable performance. Similarly, though testimony from Agent Robinson allowed prosecutors to introduce a mug shot line-up shown to witnesses, which implicated Hardamon, nearly every government witness also made an in-court identification of Hardamon as "CJ," the drug supplier in Alton.

Fourth, having exhausted his critique of defense counsel's trial performance, Hardamon turns to his attorney's handling of the sentencing hearing. Hardamon argues that his attorney did not adequately prepare for the sentencing hearing and as a result missed a crucial objection to the PSR. Specifically, Hardamon points to statements by Overton, which attributed twenty ounces of cocaine to Hardamon, and claims that they were contradictory and unreliable. Hardamon argues this point, knowing full well that we affirmed his conviction and sentence on direct appeal, *see United States v. Hardamon*, 188 F.3d 843, 852 (7th Cir. 1999), but claims that his attorney should have called Overton to the stand at the sentencing hearing. Because Overton was clearly a hostile witness, we fail to see how not calling her to testify was so unreasonable as to amount to ineffective assistance.[1]

Fifth, Hardamon urges us to find that his attorney failed to investigate the case adequately. In support of this argument, he offers a personal affidavit and an affidavit from his father attesting to their shared belief that trial counsel made no meaningful investigation. Hardamon, however, does not explain how or in what manner his trial attorney failed to investigate the case, and his brief makes only passing mention of this argument without developing it. As we have stated, "a petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing the

---

[1] We also note that in the district court's rejection of this argument, the court confirmed that its adoption of the PSR recommendations was not based solely on what Overton told probation officers. In fact, the court had ample opportunity to observe Overton at trial and determine her credibility. From those observations as well as the PSR, the district court rejected Hardamon's argument that failure to challenge Overton's statements amounts to ineffective assistance; we agree.

court sufficiently precise information, that is, 'a comprehensive showing as to what the investigation would have produced.'" *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir. 1990). Hardamon did not do so.

Hardamon's sixth and final argument is that his attorney's probationary status, and his apparent failure to disclose that status to his client, rendered his performance deficient. Hardamon, however, did not demonstrate how trial counsel's probationary status related to any error at trial. *Bond v. United States*, 1 F.3d 631, 637 (7th Cir. 1993). We have held that the suspension of an attorney does not amount to *per se* ineffective assistance, and probationary status is less of a sanction than suspension. *Id.* Accordingly, we find that defense counsel's performance, when taken as a whole, does not violate the performance prong of the *Strickland* test; it was not so unreasonable as to fall below an objective standard of reasonableness under prevailing professional norms.

Hardamon's claim also fails the prejudice prong of the *Strickland* test. Hardamon concedes that sufficient evidence supported his conviction, and his only argument regarding prejudice is that the evidence supporting his guilt was not overwhelming. We find that there is no reasonable probability that, but for his trial attorney's performance, the result of the trial would have been different.

Finally, at oral argument Hardamon dispensed with his contention that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), is applicable on collateral review in light of this Court's decision to the contrary in *Curtis v. United States*, 294 F.3d 841 (7th Cir. 2002), *cert. denied*, __ U.S. __, 123 S.Ct. 451 (2002). The district court, therefore, properly denied his petition for a writ of habeas corpus.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*