**Anibal SANTIAGO, Petitioner–Appellant,**

v.

**Charles HINSLEY, Respondent–Appellee.**

No. 03–1316.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 2004.

Decided March 9, 2004.

Kevin Banasik, Winston & Strawn, Chicago, IL, for Petitioner-Appellant.

Michael M. Glick, Office of the Atty. General, Chicago, IL, for Respondent-Appellee.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

## ORDER

Twenty-two years ago, an Illinois jury convicted Anibal Santiago and two of his three codefendants, Edwin Gutierrez and Eduardo Rosario, of murdering Juan Gomez in October of 1981. Santiago was sentenced to a term of 70 years for the crime, while Gutierrez and Rosario received sentences of 50 years and 40 years, respectively. On direct review, the Appellate Court of Illinois affirmed the convictions and sentences of all three defendants, *People v. Gutierrez*, 136 Ill.App.3d 774, 91 Ill.Dec. 458, 483 N.E.2d 944 (1985), and the Illinois supreme court declined to hear their case, *People v. Gutierrez*, 111 Ill.2d 560, 93 Ill.Dec. 157, 486 N.E.2d 258 (1985).

Some 10 years later, Santiago filed a postconviction petition in state court claiming that his trial counsel was constitutionally ineffective for not introducing his medical records at trial to refute witness testimony that he was running from the scene of the crime and for not challenging the introduction at sentencing of a statement he made while recovering from surgery. Santiago's petition was denied by the trial court and the state appellate court, *People v. Santiago*, 283 Ill.App.3d 1111, 237 Ill.Dec. 48, 708 N.E.2d 851 (1996), and the Supreme Court of Illinois denied his petition for leave to appeal, *People v. Santiago*, 173 Ill.2d 541, 226 Ill.Dec. 137, 684 N.E.2d 1340 (1997).

Santiago ultimately filed a petition for a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254, arguing that his trial and sentencing counsel were ineffective. In denying his petition, the district court held that the Illinois state court did not unreasonably apply Supreme Court precedent in rejecting Santiago's ineffective-assistance claim. We now consider Santiago's appeal of that decision. We start with the facts, which come from the record compiled in state court.

Gomez was shot five times while changing a tire in the alley behind his apartment on the west side of Chicago. A witness, Charles Kidd, identified Santiago as one of several men in two cars seen loitering around the street near Gomez's apartment prior to the murder. Kidd saw three men leave the cars and go into the alley behind Gomez's apartment. The cars, a Buick and a Pontiac, followed the men toward the opening of the alley. Kidd then heard a series of gunshots and saw at least three men run out of the alley and jump in the waiting Buick on the driver's side. Kidd

testified that as the Buick drove away, the driver, whom he identified as Santiago, yelled and pointed his finger at Kidd.

Two other witnesses testified that they saw three men running down the alley after the shooting. One witness identified one of the men as Santiago and said he was wearing a black leather jacket and dark pants. The witness also testified that she saw Santiago carrying a gun. The other witness could not identify Santiago, but did testify that one of the men was stocky and wearing a black leather jacket.

Within twenty minutes of the shooting, a Chicago police officer stopped a Buick driven by Santiago two miles from the site of the shooting. The Buick was stopped because its license plate (QA 2807) was similar to a partial description of the plate (QA 24 plus two other numbers) of the Buick fleeing the scene of the murder. Three other men were in the Buick besides Santiago. The police did not find any weapons in the Buick, but they did recover two guns from a Pontiac found near the murder scene. The two guns were identified as the murder weapons. Based on this evidence, Santiago and two of his three co-defendants were convicted.

At Santiago's sentencing hearing, police detective John Howell, a gang-crimes specialist, testified about an interview he conducted with Santiago almost exactly a year before Gomez's murder. On October 8, 1980, Santiago was shot twice, once in the neck and once in the left thigh. Howell interviewed Santiago in his hospital room on the evening of October 9. Howell testified that Santiago could not speak, so he wrote his answers on a slate. When asked if he knew who shot him, Santiago wrote that it was a Latin King. When asked if he could identify the shooter, Howell testified that Santiago wrote, "Keep it on the street." Howell asked Santiago if he knew why he was shot, and Santiago wrote,

"That I run with the C's." Howell testified that the Latin Kings and the "C's"–Spanish Cobras–were gangs operating in the area of Santiago's shooting. On the basis of Howell's testimony, the trial judge found that Santiago, who was a leader of the Cobras, killed Gomez as an act of revenge for his own shooting.

In support of his post-conviction petition, Santiago submitted records detailing his medical treatment on the day he was interviewed by Detective Howell. The medical records show that shortly before midnight on October 8, Santiago underwent five hours of surgery during which the doctors first performed a tracheostomy and repaired the bullet wound to his neck. The bullet that entered Santiago's left thigh continued through to his rectum and lodged in his right buttock. Santiago's rectum was so severely damaged that the doctors performed a colostomy–the surgical rerouting of the colon to the abdominal wall to create an outlet for waste. Roscoe N. Gary & Louise J. Gordy, *Attorneys' Textbook of Medicine* Vol. 16, ¶ 231.34 (3d ed.2003). Santiago's surgery ended at four in the morning on October 9, and he was discharged to the Intensive Care Unit. During the course of the day, Santiago received three doses Demerol–a painkiller–50 mg at 5:20 a.m., 75 mg at 12:20 p.m., and 100 mg at 8:20 p.m. Detective Howell testified that he visited Santiago sometime around 7:00 p.m. that evening.

Santiago claims that he was denied his Sixth Amendment right to effective assistance of counsel. Our review of the state court's adjudication of Santiago's ineffective assistance claim is governed by 28 U.S.C. § 2254. Section 2244(d) provides that where, as here, a state court adjudicates a prisoner's constitutional claims on the merits, a federal court may grant habeas relief only if the state court's decision was contrary to or involved an unreason-

able application of clearly established federal law as determined by the Supreme Court of the United States. *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is contrary to Supreme Court precedent if the "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams,* 529 U.S. at 407, 120 S.Ct. 1495.

An unreasonable application of Supreme Court precedent occurs when the "state court unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle . . . to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* We have described an unreasonable application as one "lying well outside the boundaries of permissible differences of opinion." *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir.2002). To prevail on his ineffective assistance claims, Santiago must demonstrate that his counsel's performance fell below an objective standard of reasonableness, and that it caused him prejudice. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Santiago first argues that the Illinois appellate court's decision was contrary to Supreme Court precedent because it did not explicitly articulate the two-prong test set forth in *Strickland v. Washington.* However, the state court properly identified *Strickland* as the controlling standard and clearly applied the performance prong of the *Strickland* test. *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (holding that a state court decision is not contrary to federal precedent unless it contradicts clearly established law). The Appellate Court of Illinois's decision was therefore completely consistent with federal law.

Next, Santiago argues that the state court made an unreasonable determination that his counsel was not ineffective for failing to challenge the introduction of statements he purportedly made to Detective Howell when hospitalized and recovering from surgery. Santiago claims that because he was in pain and under the influence of Demerol, his statements were not made of his free will. Santiago's claim was rejected by the Appellate Court of Illinois under the first prong of *Strickland.* The court explained:

> At the time defendant made the statements, he was hospitalized and under the influence of the painkiller, Demerol. While being interviewed as a crime victim, defendant coherently responded to the detective's questions by writing out his answers on a slate. Under these circumstances, a reasonable attorney could conclude that defendant had the ability to voluntarily and knowingly make the statements.

Underlying factual determinations made by state courts are presumed to be correct and a federal habeas corpus petitioner has the burden of rebutting that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Davis v. Litscher,* 290 F.3d 943, 946 (7th Cir.2002). The state court here found that Santiago was coherent when he made the statements to Howell, and he has not presented any evidence to the contrary.

Nonetheless, Santiago compares himself to the defendant in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In *Mincey,* the defendant was questioned in an intensive care unit with a hip wound he sustained a couple of hours before being questioned. 437 U.S. at 398,

98 S.Ct. 2408. Like Santiago, Mincey could not talk and had to write his answers to the officer's questions. *Id.* at 398–99, 98 S.Ct. 2408. Unlike Santiago, however, Mincey repeatedly asked the police to stop the interrogation, requested his lawyer, slipped in and out of consciousness, and complained of being confused and unable to think clearly. *Id.* at 399–401, 98 S.Ct. 2408. Santiago has provided no evidence that he could not understand the officers' questions or that he did not wish to talk to the police. Also, Mincey was being questioned as a suspect while Howell viewed Santiago as a victim.

█ Santiago also argues that his statement was involuntary simply because he was on Demerol. The recommended dosage for Demerol is 50 mg to 150 mg, every 3 or 4 hours. *See Physician's Desk Reference* at 2992 (57th ed.2003). At most, Santiago received 275 mg that day.[1] At the time of the questioning, Santiago had received only 125 mg of Demerol–50 mg at 5 a.m. and 75 mg at noon–more than six hours before being questioned. Although Santiago was injured and under medical care at the time, the dosage of painkilling medication administered to him was not sufficient to overbear his will to resist the questioning or impair his rational faculties. *See, e.g., United States v. Martin,* 781 F.2d 671, 673–74 (9th Cir.1985). The Appellate Court of Illinois reasonably concluded that Santiago's statement was voluntary and that counsel's decision not to challenge it constituted adequate performance.

Santiago also argues that counsel was ineffective because he failed to investigate and introduce medical records that would have shown that Santiago was incapable of running at the time of the murder. Evidence that Santiago could not have been one of the men seen running from the murder scene would have refuted all of the eyewitness testimony against him. Santiago's claim was rejected by the Appellate Court of Illinois on the basis of the second prong of *Strickland.* The court explained:

> The medical records in question document that defendant's groin wound was a year old at the time of the murder and had completely healed. Since defendant was clearly ambulatory, the medical records present no inconsistencies when considered in conjunction with the testimony of three witnesses who saw him running from the scene.

Santiago is correct that effective representation requires pretrial investigation of potentially fruitful defenses. *Brown v. Sternes,* 304 F.3d 677, 691 (7th Cir.2002). This duty is subject, however, to the reasonable judgment of defense counsel; "a particular decision not to investigate must be directly assessed for reasonableness in light of all the circumstances." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The reasonableness of counsel's judgments depends significantly on his familiarity with Santiago's condition.

In preparation for Santiago's post-conviction petition, Santiago's trial counsel, Gregory Schlesinger, provided an affidavit explaining why he did not subpoena Santiago's medical records. Schlesinger stated that he was aware of Santiago's hospital-

---

1. Santiago's brief, and a supporting affidavit by a pharmacologist, state that Santiago received 275 mg of Demerol on October 9th, (Appellant's Br. at 23; Appellant's App. at 42), but, by our calculations, Santiago received a total of 225 mg that day, (Common Law Record, Vol. I. at 196). Santiago received 50 mg of Demerol in the early morning and 75 mg at 12:20 p.m., more than six hours before being questioned by the police. (*Id.*). Santiago received the final 100 mg of Demerol at 8:20 p.m., but the evidence does not show, and Santiago does not claim, that he received the 8:20 p.m. dosage prior to or during the questioning by police officers.

ization and believed he had visited Santiago because, at the time, he was representing him in an unrelated case. Schlesinger stated that he did not subpoena Santiago's medical records because he "knew that on the day of the shooting in this case Mr. Santiago was ambulatory and had been arrested shortly after the shooting driving his own car." Generally, when an attorney articulates some strategic reason for a decision not to investigate, courts will defer to that choice. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. As Santiago points out, however, being ambulatory means having the ability to walk, not run. Black's Law Dictionary 80 (7th ed.1999). Because it does not necessarily follow that Santiago's ability to walk and drive a car meant that he could also run, Schlesinger's decision not to subpoena the medical records and investigate could be deemed to be an unreasonable decision and thus deficient performance.

■ However, even assuming that counsel performed deficiently, Santiago cannot prevail on his ineffective assistance claim because he cannot show that he was prejudiced by the failure to investigate. Santiago's post-operative report shows the colostomy would be reversed "when the patient's other wounds are totally healed." After Santiago's release in November 1980, there is a significant gap in the medical records. The records show a short hospitalization in December 1980, but then skip to January 1982, when Santiago's colostomy was reversed–while he was in custody awaiting trial on the Gomez murder. There is no medical evidence for the nine months preceding Gomez's murder.

Although Santiago's colostomy was not reversed until after Gomez's murder, the doctor's notes on that procedure show that the colostomy closure was first attempted nine months earlier in January 1981. Presumably, Santiago's wounds had sufficient-ly healed by January 1981 to undergo the surgical procedure. The medical records do not indicate why the first colostomy closure was unsuccessful, but they do show that a second attempt was scheduled for April 1981, but Santiago was "unable to make [the] appt." Santiago's failure to reschedule his colostomy closure until after he was arrested for killing Gomez, even though doctors clearly believed he was ready for the procedure, suggests that his medical condition did not significantly interfere with his daily life activities.

The only piece of evidence Santiago has that directly addresses his physical abilities at the time of the murder is his unsigned affidavit. In that affidavit, Santiago states that on "the date of the shooting, I was being treated for a groin wound [and] a wound on my thigh, such that it was impossible for me to run down the alley or street. In addition I was wearing a colostomy bag. . . ." Santiago has provided no evidence that using a colostomy bag prevented him from running.

Further, none of the medical records clearly suggest that his injuries precluded running, and he presents no evidence explaining that the records in fact show such a limitation. A petitioner alleging ineffective assistance of counsel due to a failure to investigate bears the "burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced." *Hardamon v. United States,* 319 F.3d 943, 951 (7th Cir.2003) (internal citation and quotations omitted). Here, Santiago has not provided any evidence that would have refuted the witnesses' testimony that they saw him running down the alley after the murder. Thus, Santiago has not shown that his attorney's failure to subpoena the records caused him any prejudice.

The Appellate Court of Illinois did not unreasonably apply Supreme Court precedent and so we affirm the district court's judgment denying Santiago's habeas corpus petition.