In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1099

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PHILLIP C. LATHROP,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-CR-124—**Barbara B. Crabb**, *Judge.*

ARGUED DECEMBER 7, 2010—DECIDED MARCH 2, 2011

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Phillip Lathrop owned Player's Bar and Grill, a sports bar located in Hayward, Wisconsin. Confronted with dwindling profits and escalating insurance premiums, Lathrop paid an employee to torch the bar for the insurance proceeds. His employee—loyal only to a point—eventually confessed and told police of Lathrop's involvement. Lathrop was ultimately found guilty of one count of arson, four counts of mail

fraud, and one count of criminal forfeiture. After the district court denied Lathrop's motion for a new trial, he appealed his conviction, arguing that his trial counsel rendered ineffective assistance and that the government engaged in misconduct when it made improper remarks during its closing argument. Because trial counsel was constitutionally competent and the government's various remarks were either proper or not so prejudicial as to warrant a new trial, we affirm Lathrop's conviction.

## I. BACKGROUND

Business was not exactly booming at Player's Bar and Grill, a bar Lathrop owned and operated in Hayward, Wisconsin. Between 2002 and 2003, unruly patrons began starting fights in the bar, scaring off Player's more peaceful clientele. Believing that his Native American customers were the primary instigators, Lathrop changed his identification policy: he no longer accepted tribal identifications for service, instead taking only state identifications. This change upset a number of his Native American customers. One of these customers—Joe Morey—made threats against the bar, going so far as to state that if Lathrop didn't make a change, Lathrop wouldn't have a bar left to turn him away from.

By mid-2003, Player's business was still nothing to write home about. Lathrop had already tried—unsuccessfully—to sell the bar. Faced with diminishing profits, Lathrop decided to have the bar torched for the insurance money. To that end, Lathrop met with bar employee

David Maki, who routinely performed odd tasks for Lathrop in exchange for money and drugs. Lathrop told Maki of the bar's woes and offered him $5000 and some cocaine if he would burn Player's to the ground. Maki agreed.

On the night of August 15, 2003, Maki and Lathrop met at Lathrop's home. Lathrop's insurance policy on the bar with Capitol Indemnity was set to expire soon, and Lathrop told Maki that the fire had to happen now. Lathrop directed Maki to break into the bar through the game room door, remove Tiki torches from the bar's patio, and use the torch fuel to set a fire in the attic. Lathrop informed Maki that a fire in the attic would cause the roof to collapse, obliterating the bar (and his financial woes). Maki was also ordered to break into the gambling machines, to make the arson look like a robbery, and to remove the videotape from the bar's security camera recorder to cover his tracks. As a down payment for Maki's performance, Lathrop gave him two eight balls of cocaine.

In the wee hours of August 16, 2003, Maki broke into Player's and set the fire as instructed. By the time emergency services responded, there was little left of the bar. Lathrop arrived at the scene shortly thereafter and acted hysterical at the sight of the bar's remains. He informed police that he had no insurance on the bar, began hyperventilating, and was sent to the hospital for evaluation.

Police soon discovered traces of an accelerant in the rubble and ruled the fire an arson. Analysis showed that

the accelerant was the same type of fuel used in Player's tiki torches. Mike Van Keuren, a state arson investigator, was assigned to investigate the fire.

About a week after the fire, Lathrop and Maki met to debrief. Maki told Lathrop that things went as planned save for one wrinkle: Maki ran out of time and did not break into the gambling machines. He also told Lathrop that he still had the videotape from the bar's security cameras. Lathrop chastised him for these oversights and told him to destroy the tape immediately. All in all, however, Lathrop did not think Maki's slip-ups were worthy of serious concern—he told Maki that he faked a heart attack at the scene and that his theatrics convinced the police. The two shared a laugh about Lathrop's act. Shortly thereafter, Lathrop filed a claim with Capitol Insurance, a claim that was later paid out.

As the arson investigation continued, Lathrop evidently became concerned about his ability to get away with the scheme. He decided to try to divert attention away from himself and Maki. Two weeks after the fire, Lathrop met with Maki and another bar regular, Tom Crowley. Lathrop offered $5000 to Crowley if he would tell police that he heard Morey boast about paying someone to set fire to Player's. Crowley declined.

One month after the fire, Investigator Van Keuren contacted Maki and set up an interview. Shortly before the interview, Lathrop and Maki again met. Still attempting to implicate Morey, Lathrop asked Maki to tell the investigator that Morey had unsuccessfully attempted to hire Maki to burn down the bar before the fire. Maki agreed.

On October 1, 2003—the day of Maki's interview with Van Keuren—Lathrop and Maki had yet another sit-down. This time, another bar regular, Ryan Magnuson, was present. Magnuson observed the two openly discuss the arson. Lathrop then asked Magnuson to go with Maki and back up his lie about Morey. While Magnuson first agreed, he got cold feet at the interview and said nothing. Maki, however, stuck to the plan during his discussion with Van Keuren and claimed Morey tried to hire him to burn down the bar.

Morey did not take being falsely implicated lying down. In June 2004, Morey and four of his associates confronted Maki about his statements to police. Maki and Morey went on a long walk, during which Morey told Maki that he was upset about Maki's statements. Maki eventually told Morey that he set the fire and admitted that Lathrop had hired him to do so. Maki also told Morey that he would eventually turn himself in to police.

In early August 2007, Maki confessed to police about his role in the insurance scheme. He told officers that he had committed the arson and that Lathrop had paid him to do so. He admitted that his statement to Investigator Van Keuren about Morey was a lie Lathrop concocted to divert attention away from himself and Maki. He went on to state that Lathrop had faked chest pain when he arrived at the scene of the fire to throw police off.

In August 2008, Lathrop was charged with one count of arson, four counts of mail fraud, and one count of criminal forfeiture. Four days before trial, Lathrop's attorney,

Chris Van Wagner, appeared for the final pretrial hearing and moved for a continuance. Van Wagner claimed that he had only recently received materials from the government that gave him notice of the government's theory that Lathrop had the bar torched because business was slow. The court initially denied the motion, but it later granted a brief continuance when Van Wagner stated he had not yet done what was ethically necessary to prepare for trial.

Trial began on February 23, 2009. At voir dire, all of the jurors were asked whether they were related to anyone affiliated with the insurance industry. Some prospective jurors responded affirmatively and were dismissed. On the following day, one juror, Paul Ritschard, advised the court that his brother worked for Capitol Indemnity (the insurer of the bar). The court advised Van Wagner of this. After briefly discussing the matter with Lathrop, Van Wagner told the court that he would need to give the manner "some thought" and asked the court to bring it up again later.

Over the course of five days, the government presented evidence regarding the arson and the insurance scheme. The government showed that the bar's profits had decreased over the course of 2002 and 2003, that Lathrop had unsuccessfully tried to sell the bar during that period, that his insurance premium was set to increase mere days before the fire, and that his policy expired soon after the bar was burned down. The government also proffered testimony from investigators that the fire was arson and from Maki and others regarding Lathrop's

involvement in the scheme. The defense provided evidence that the bar's business was stable, that Lathrop had obtained other insurance which lowered his premiums, that Maki was lying, and that Morey was a viable alternative suspect.

During its closing argument, the government highlighted Lathrop's motive for having the bar torched—essentially, business was bad and Lathrop's premiums were skyrocketing. The government went on to bolster Maki's credibility, observing that Maki had made statements to others regarding Lathrop's acts consistent with his testimony at trial. The government also noted that Maki confessed in part to fulfill a promise to his dying mother. Lathrop objected to this part of the government's closing, but the objection was overruled.

Prior to sending the jury out for deliberation, the district court again reminded Van Wagner at sidebar of juror Ritschard's possible conflict of interest. Van Wagner told the court that he had forgotten about the matter and wanted to keep the juror on. On February 27, 2009, the jury, with Ritschard as foreman, convicted Lathrop on all counts. After the verdict, the court reprimanded Van Wagner for his earlier pretrial continuance request.

On June 3, 2009, after being appointed new counsel, Lathrop filed a motion for a new trial, arguing that Van Wagner's various errors constituted ineffective assistance of counsel. The district court denied the motion after an evidentiary hearing and ultimately sentenced Lathrop to 84 months' imprisonment. Lathrop timely appealed his conviction.

## II. ANALYSIS

On appeal, Lathrop again claims that his trial counsel rendered ineffective assistance based on a litany of trial errors. He also claims that several of the government's remarks during its closing argument were improper. In sum, Lathrop presents nearly a dozen sources of error, effectively ignoring our advice that the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis. *Cf. United States v. Pearson*, 340 F.3d 459, 464 (7th Cir. 2003) (the "kitchen-sink" metaphor); *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) (more discussion of the kitchen-sink approach); *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 955 (7th Cir. 1996) (advising appellants to use a rifle approach to briefing rather than bringing "their shotgun to Chicago"); *United States v. Levy*, 741 F.2d 915, 924 (7th Cir. 1984) (again with the dreaded shotgun tactic). Nevertheless, we forge on, considering each of Lathrop's many claims in turn.

### A. Ineffective Assistance of Counsel

Lathrop first complains that Van Wagner rendered ineffective assistance throughout the guilt phase of his trial. He claims that trial counsel did not obtain adequate assurances of impartiality from an allegedly biased juror, neglected to investigate evidence and testimony that would show Lathrop's innocence, and failed to call crucial witnesses in his defense.

We typically do not review ineffective assistance of counsel claims on direct appeal. *United States v. Best*,

426 F.3d 937, 944 (7th Cir. 2005). That said, we have recognized an exception to this rule for cases in which the defendant's claim "can be fully evaluated only on the record below," without resort to extrinsic evidence. *United States v. Holman*, 314 F.3d 837, 839 (7th Cir. 2002). Lathrop's case represents just such an exception: he moved for a new trial on ineffective assistance grounds and the district court conducted an evidentiary hearing regarding counsel's performance. The record thus sufficiently developed, we may proceed to the merits of Lathrop's ineffective assistance claims.

To prevail on an ineffective assistance of counsel claim, Lathrop must show that trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 689-92 (1984). Under the procedural posture of this case, "[w]e review those two questions *de novo*." *Best*, 426 F.3d at 945. We begin with the presumption that Lathrop's counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, and we place the onus on Lathrop to defeat this presumption by showing that counsel's performance "fell below an objective standard of reasonableness" based on prevailing norms of professional conduct, *id.* at 688. Assuming Lathrop clears this hurdle, he can establish prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

We note at the outset that our review of an attorney's tactical decisions is highly deferential. *Johnson v.*

*Thurmer*, 624 F.3d 786, 792 (7th Cir. 2010). "Trial tactics are a matter of professional judgment, and . . . we will not play 'Monday [or Tuesday] morning quarterback' when reviewing claims that an attorney rendered constitutionally deficient representation in making decisions on how to best handle a case." *United States v. Malone*, 484 F.3d 916, 920 & n.1 (7th Cir. 2007). In other words, it is not our task to second-guess counsel's judgment and replace it with our own. So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally "cannot support a claim of ineffective assistance of counsel." *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005).

Lathrop first argues that his counsel's failure to obtain an assurance of impartiality from one juror after the juror disclosed a possible conflict of interest constituted ineffective assistance. It is true that an attorney's failure to question jurors regarding possible bias can potentially constitute deficient performance. *See United States v. Monigan*, 128 F.3d 609, 612-13 (7th Cir. 1997). But trial strategy can also justify an attorney's decision not to seek an assurance of impartiality from a juror, even after a juror has made statements implying possible bias. *Cage v. McCaughtry*, 305 F.3d 625, 627 (7th Cir. 2002). So long as counsel's reasons for not questioning further were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel," his performance will not qualify as deficient. *Id.*

At the evidentiary hearing, Van Wagner laid out his trial strategy regarding the juror at issue. Van Wagner

testified that he asked Lathrop about Ritschard after the possible conflict came to light and that, after their consultation, Van Wagner decided to keep Ritschard on without further questioning. According to Van Wagner, both he and Lathrop liked Ritschard because he was a sports afficionado who might be sympathetic to Lathrop (a former sports bar owner). Van Wagner claimed that he did not seek an assurance of impartiality from Ritschard because he was concerned that further questioning would reveal his preference for that juror and thus lead the government to strike Ritschard. He delayed informing the court because he didn't want the government to inquire further. He was also nervous about replacing Ritschard with one of the alternates, who were both unknowns and thus potential liabilities. Taking Van Wagner's reasons in sum, we believe the strategy employed—like the strategy in *Cage*—was satisfactory, especially under the forgiving *Strickland* standard. As such, this ineffective assistance claim fails for want of deficient performance.

Lathrop claims that the Sixth Circuit's decision in *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001), compels a finding of ineffective assistance. In *Hughes*, the court held that no strategy could support counsel's decision to not strike a juror or forego obtaining an assurance of impartiality once the juror manifested actual bias; such a decision was per se ineffective assistance. *See id.* at 463. We need not decide whether to adopt this reasoning, as the case at bar is dissimilar to *Hughes* in one critical respect: there was no actual statement of bias by a juror here, but only a statement suggesting a

possible conflict of interest. Even when jurors have gone so far as to make a statement of implied bias and no clear assurance of impartiality was subsequently obtained, we have recognized that a strategy of silence by counsel could be reasonable. *See Cage*, 305 F.3d at 627. Clearly then, silence may be a reasonable strategy when a juror has not even gone so far as to imply bias, but has instead merely revealed a potential, attenuated conflict of interest. Van Wagner had such a reasonable strategy in this case, vitiating a finding of ineffective assistance.

Lathrop next complains that counsel was deficient for not investigating three witnesses—David Maki, Jaclyn Rohlfing, and Richard Martin[1]—before trial. It is well recognized that counsel must engage in a reasonable investigation or come to a defensible decision that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 691. When counsel determines that investigation is unnecessary, his decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments*." Id.*

Under this standard, we find Van Wagner's conduct involving Maki constitutionally competent. Lathrop claimed that Van Wagner was deficient for not interviewing Maki regarding his motive for confessing (Maki allegedly came clean to honor his recently

---

[1] With one exception, the parties refer to Martin as "John Martin" in their briefs, yet their citations to the record reflect that his name was actually "Richard R. Martin."

deceased mother) and for not attacking Maki about his motive at trial. But Van Wagner did try to question Maki through his investigator, and Maki ignored those efforts. Van Wagner was convinced that further attempts would be fruitless, and that judgment was reasonable given Maki's already-manifested resistance. *Cf. Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002) ("It is often times a reasonable exercise of professional judgment to limit or terminate further investigation when counsel determines that a particular investigation would be fruitless.").

Van Wagner's decision to avoid the "dead mother" motive at trial was also defensible. Van Wagner was concerned that any attack on Maki regarding his mother might backfire and garner Maki sympathy points with the jury. He also believed that Maki's statements at trial regarding his motive to confess were not as strong as they were at the grand jury proceedings, so he was reasonably fearful that pressing the matter might result in the grand jury testimony being admitted into evidence as prior consistent statements. Instead, Van Wagner opted for a strategy of drawing out the inconsistencies in Maki's story regarding the arson—a reasonable tactic given the circumstances of the case.

Lathrop goes on to claim that Van Wagner was deficient for failing to arrange pretrial interviews with Jaclyn Rohlfing and Richard Martin. Even if we were to assume this conduct was deficient—a highly unlikely leap given that Lathrop did interview these two witnesses before they testified—this claim would still

fail for lack of prejudice. When a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced. *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003). For these two witnesses, Lathrop has neglected to tell us what evidence would have been gleaned from additional investigation, and his generalized claim that additional testimony would have made a difference is insufficient to satisfy his burden.

Lathrop's final ineffective assistance argument is that counsel was deficient for not calling two witnesses—Kevin Mell and Jennifer Rohlfing—at trial. We can dispense with this claim quickly, as counsel investigated these witnesses enough to discover defects about their proposed testimony that led him to decide not to call them during his case in chief. *See Best*, 426 F.3d at 945 (noting that "[i]f counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic" and generally not subject to review). Van Wagner did not call Mell because he discovered that the tax returns Mell would have relied on were likely inaccurate, were based on hearsay, and could be used by the government to show that Lathrop engaged in tax fraud. Van Wagner did not call Jennifer Rohlfing based on his observations of her during trial preparation; he was concerned that she would fall apart during the government's cross-examination. Counsel's decisions regarding Mell and Jennifer Rohlfing were reasonable, and thus this claim fails.

*B.  Prosecutorial Misconduct*

Lathrop next complains that the prosecutor engaged in misconduct at several points during his closing. "In reviewing a claim of prosecutorial misconduct, we consider first whether the challenged remark by the prosecutor was improper, and second, whether it prejudiced the defendant." *United States v. Klebig*, 600 F.3d 700, 718 (7th Cir. 2009).

Lathrop first claims that the government acted improperly when it knowingly relied on perjured testimony proffered by Maki during its closing. At trial, Maki testified that his mother was "the most important person in [his] life at the time" and that his mother "had just passed away not too long before" he confessed to police. Lathrop argues that Maki lied when he made these statements, as evidence discovered after the trial showed that Maki's mother died in January 2003, over four years before he confessed to police.

For the government to have committed misconduct in the manner alleged, Lathrop must first show that Maki perjured himself. "One commits perjury if, while under oath, he or she gives false testimony concerning a material matter with a willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. White*, 240 F.3d 656, 660 (7th Cir. 2001). We are perplexed as to how Maki's first statement—that his mother was an important part of his life—could ever qualify as perjury. Lathrop seems to argue that Maki's sentiment could be truthful only if Maki's mother was alive at the time that Maki claimed

she was important to him, but we are fairly sure that relatives can be important to their kin long after they have departed. Even if we accept Lathrop's supposition, we would still find no perjury. Maki's statement was in response to a question involving the time spanning from 2001 to 2004; during most of that period, Maki's mother was indeed alive. Either way, Lathrop has not shown that Maki's sentiment regarding his mother was a lie (a difficult—and cold—burden to shoulder).

Maki's second statement—that his mother passed away not long before he confessed—also did not qualify as perjury. First, his statement is subject to a number of interpretations. Reasonable parties could disagree about what time span is too long to qualify as "recent," especially when a person is discussing the death of a loved one. Second, his statement was given in response to the government's efforts to clarify previous defense questioning regarding a long, muddled period of time. It is therefore just as likely that Maki's statement was the product of confusion; he could have been trying to indicate that his mother passed away shortly before the August 2003 arson. Lathrop has failed to show that Maki's statement was not the product of confusion, much less that it rose to the level of willful deceit. With no showing of perjury, Lathrop has not established that the government acted improperly when it relied on Maki's statements.

Lathrop next argues that the government's remark that Maki confessed to fulfill "a promise to his dying mother" during its closing was improper, as Maki's mother died long before he confessed. We agree with

Lathrop that the prosecutor's remark was improper, as he misconstrued Maki's statements regarding the timing of his mother's death vis-à-vis his confession. But to warrant reversal, Lathrop must also show that this single error robbed him of a fair trial. *Klebig*, 600 F.3d at 720. To determine the effect of improper remarks on the fairness of the trial, we look to a number of factors, including the nature and seriousness of the remarks, whether the remarks were invited by the defense, whether the remarks could be rebutted by defense counsel, whether the district court provided a curative instruction, and the weight of the evidence against the defendant. *United States v. Bell*, 624 F.3d 803, 813 (7th Cir. 2010); *Klebig*, 600 F.3d at 720-21.

While it is a close case, we find that these factors weigh against a finding of prejudice. It is true that the remarks were neither invited by the defense nor rebuttable. But we do not believe that the prosecutor's remark was so seriously improper as to cause Lathrop prejudice, as Maki's testimony made clear to the jury that his mother had died before he confessed to police. Moreover, the prosecutor backpedaled from his statement regarding the timing of Maki's confession after defense counsel objected. He advised the jury that, if it remembered Maki's testimony differently, its recollection controlled. In addition, the district court, while not striking the prosecutor's statements, did provide a cautionary instruction to the jury that the prosecutor's remarks were not evidence and that if the jury's recollection of Maki's testimony was contrary to the prosecutor's statement, its recollection won out.

Finally, we note that there was overwhelming evidence of Lathrop's guilt: Maki implicated Lathrop, Maki's testimony was corroborated by other witnesses, and multiple witnesses testified that Lathrop discussed his role in the arson and went so far as to ask for their help in implicating another party as the arsonist.[2] *See United States v. Alviar*, 573 F.3d 526, 543 (7th Cir. 2009) (noting that overwhelming evidence can eliminate "any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations"). Accordingly, we conclude that the government's remark did not render the trial unfair.

The remainder of Lathrop's prosecutorial misconduct claims do not warrant extended attention. Lathrop did not object to the government's discussion of his insurance motive or to its assertion that Maki made consistent statements regarding Lathrop's involvement "right after" the arson, and thus our review is for plain error. *United States v. Hills*, 618 F.3d 619, 635 (7th Cir. 2010). The gov-

---

[2] Lathrop argues that the district court's statements during the evidentiary hearing preclude a finding that there was overwhelming evidence of Lathrop's guilt. But the district court's statements—that this was "not an open and shut case" and that "there were a lot of questions in [the district court's] mind after the trial was over"—were in reference to Lathrop's ineffective assistance claim and the reasons given by counsel for not cross-examining another possible suspect regarding his alibi. The statements had nothing to do with the weight of the evidence against Lathrop, and the court went on to hold that trial counsel's failure to attack the other suspect's alibi caused no prejudice to Lathrop's defense.

ernment's remark that Maki discussed Lathrop's involve-
ment in the arson scheme "right after" the fire was a
fair inference from the facts, as at least one witness
testified that Maki began discussing the events within
one to two months of the fire and another witness
testified that Maki hinted about the circumstances
one week after the fire. The remarks about Lathrop's
possible insurance motive were also fair inferences from
facts in evidence, even if weakened by evidence put
forth by the defense regarding Lathrop's second insurance
policy. In sum, neither statement was improper, much
less so improper as to constitute "a particularly egregious
error that resulted in a miscarriage of justice." *United
States v. Myers*, 569 F.3d 794, 800 (7th Cir. 2009).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Lathrop's con-
viction.