

FILED
Oct 24 2019, 10:43 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



# IN THE

# Indiana Supreme Court

Supreme Court Case Nos. 22S00-1601-PD-00009,
22S00-1608-PD-00411

## William Clyde Gibson, III

*Appellant (Defendant)*

–v–

## State of Indiana

*Appellee (Plaintiff)*

---

Argued: January 10, 2019 | Decided: October 24, 2019

Appeal from the Floyd County Superior Court, No. 22D01-1606-PC-4
The Honorable Susan L. Orth

Appeal from the Floyd County Superior Court, 22D01-1703-PC-4
The Honorable Susan L. Orth

On Direct Appeal

---

**Opinion by Justice Massa**

Chief Justice Rush, Justice David, and Justice Goff concur.
Justice Slaughter not participating.

**Massa, Justice.**

William Clyde Gibson, III was convicted of and sentenced to death for the brutal murders of Christine Whitis and Stephanie Kirk. After this Court affirmed those convictions, Gibson, alleging ineffective assistance of counsel, unsuccessfully petitioned for post-conviction relief. Finding Gibson's arguments unpersuasive and largely unsupported by the record, we now affirm the post-conviction court's denial of relief. We also hold that Gibson's conflict-of-interest claim falls under our standard *Strickland* analysis for prejudice, not the presumption-of-prejudice standard under *Cuyler v. Sullivan*.

# Facts and Procedural History

### Victims, Murders, and Arrest

In March 2012, William Gibson invited Stephanie Kirk to his home, where, in an extended attack, he brutally strangled her to death and sexually assaulted her corpse. Gibson hid her naked and broken body in his garage overnight, burying her the next day in a shallow grave in his backyard. The following month, Gibson invited to his home his late mother's best friend, 75-year-old Christine Whitis. As with Kirk, Gibson violently strangled Whitis to death and sexually abused her corpse. He then dragged her nude and lifeless body to the garage, where he severed one of her breasts before leaving for a night out drinking at the bars. The following day, Gibson's sisters contacted police after discovering Whitis's body. That same evening, police arrested Gibson after a brief car chase, forcibly removing him from the vehicle when he refused to exit on his

own. A later search of the vehicle revealed Whitis's severed breast lying in the center console.[1]

## Investigation, Confessions, Charges, and Appointment of Defense Counsel

While in custody, Gibson repeatedly asked to speak with police, expressly waiving his *Miranda* rights each time. On **April 20**, the day after his arrest, Gibson confessed to killing Whitis. He also confessed to killing Karen Hodella, a woman whose murder had gone unsolved since police had found her decomposed body in early 2003.

In subsequent interviews—on **April 23, 24, and 26**—Gibson confessed to murdering Kirk (who, at the time, police did not yet know was dead) and told police where to find her body in his back yard. Arriving there, investigators found Kirk's prescription drugs inside Gibson's home and, as with Whitis, found her corpse with a broken back.

The State charged Gibson with Whitis's and Hodella's murders on **April 24**. That same day, the court appointed J. Patrick Biggs, the Chief Public Defender of Floyd County, as Gibson's defense counsel. The public defender's office, however, wouldn't formally receive the order of appointment for another three days. But on **April 26**, after receiving direct notice from the New Albany Police Department, Biggs met with Gibson, advising him, "in the very strongest possible language," to remain silent and to stop talking with police. PCR Tr. Vol. I, p.15. Biggs also told Gibson that he could be facing the death penalty for his crimes. Gibson signed a special advisement and waiver form after the trial court advised him of the potential consequences for speaking with police.

---

[1] Our citations to the briefings and to the record are as follows: "GI" refers to *State v. Gibson*, No. 22D01-1204-MR-919, the case in which Gibson was convicted for killing Christine Whitis. "GII" denotes *State v. Gibson*, No. 22D01-1205-MR-1145, the case in which Gibson was convicted for killing Stephanie Kirk. "DA" refers to the direct appeal materials for a particular case. And "PCR" indicates citations to the record in the present post-conviction proceedings.

Nearly a month later, on **May 23** the State charged Gibson with Kirk's murder, filed separate death-penalty requests for the murders of Whitis and Kirk, and refiled Hodella's murder under a separate cause number. In late June of that year, the trial court ordered a competency evaluation after Gibson attempted suicide in jail. In October, the court heard evidence and found Gibson competent to stand trial.

### Trials, Pleas, Convictions, and Sentencing

Gibson first stood trial in October 2013 for Whitis's murder (*Gibson I*). Following his conviction, the jury deliberated on four aggravators during the penalty phase: two forms of criminal deviate conduct, dismemberment, and his probation status at the time of the crime. *See* I.C. § 35-50-2-9(b)(1)(D) (2007) (criminal deviate conduct); I.C. § 35-50-2-9(b)(10) (2007) (dismemberment); I.C. § 35-50-2-9(b)(9)(C) (2007) (probation status). The jury unanimously recommended a death sentence, and the trial court sentenced Gibson accordingly in November (withholding judgment on the jury's habitual-offender finding in view of the death sentence). On direct appeal, this Court affirmed Gibson's conviction and sentence for the Whitis murder. *Gibson v. State*, 43 N.E.3d 231, 242 (Ind. 2015).

Gibson's trial for the murder of Karen Hodella was originally set for October 2014. But in March of that year, he agreed to plead guilty in exchange for a 65-year sentence in lieu of the death penalty. The State also agreed not to use the Hodella murder or conviction as a death-penalty aggravator in the pending Kirk case. *See* I.C. § 35-50-2-9(b)(8) (enabling the State to seek the death penalty for murder by alleging at least one of several enumerated aggravators, including the defendant's commission of "another murder, at any time, regardless of whether the defendant has been convicted of that other murder"). The trial court accepted the plea agreement and, in April 2014, entered judgment of conviction and sentenced Gibson accordingly.

Finally, Gibson stood trial for Kirk's murder in early June 2014 (*Gibson II*). The day after jury selection began, the defense team discussed the State's proposal for a guilty plea and a penalty decision by the court

without a jury in exchange for dismissal of a habitual-offender allegation. Gibson accepted his counsel's advice to plead guilty and to "take his chances with the Judge." PCR Tr. Vol. I, p.74. At the penalty-phase hearing, the State presented four aggravators: conviction of the Whitis murder, the same two forms of criminal deviate conduct as with Whitis, and his probation status at the time of the murder. The trial court sentenced Gibson to death in August 2014, which this Court affirmed on direct appeal. *Gibson v. State*, 51 N.E.3d 204, 216 (Ind. 2016).

## Post-Conviction Proceedings and Appeals

Gibson petitioned for post-conviction relief in all three cases, arguing ineffective assistance of counsel (**IAC**). At a consolidated hearing, three witnesses—a psychiatrist, Gibson's former attorney, and Gibson's ex-wife—testified in support of the defense's mitigation theory that Gibson had sustained a traumatic brain injury in a 1991 car crash, an injury which exacerbated his mental-health and substance-abuse problems. The post-conviction court denied relief and Gibson appealed.

The non-capital case for the murder of Hodella proceeded to the Court of Appeals after this Court denied Gibson's petition for emergency transfer. *See Gibson v. State*, No. 22A01-1711-PC-2528, 2018 WL 3421721 (Ind. Ct. App. July 16, 2018) (mem. dec.).[2] The two capital cases for the murders of Whitis and Kirk—*Gibson I* and *Gibson II*, respectively—come to this Court on direct appeal under Appellate Rule 4(A)(1)(a). After hearing oral arguments in all three cases, we now deny Gibson's petition to transfer in the Hodella case. Our opinion today, without formally consolidating the cases under Appellate Rule 38(B), addresses Gibson's post-conviction appeals in *Gibson I* and *Gibson II*.

---

[2] In rejecting Gibson's argument that his guilty plea was not entered knowingly, intelligently, and voluntarily, the panel—though acknowledging the State may have improperly induced the plea agreement by using the Hodella case as a threatened death-penalty aggravator in the Kirk case—concluded in a memorandum decision that Gibson failed to show (1) that such threat was material to his decision to plead guilty or (2) that he would have proceeded to trial had counsel properly advised him of the illusory plea. *Gibson*, 2018 WL 3421721, at *6.

## Standard of Review

Post-conviction proceedings are civil proceedings in which a defendant may present limited collateral challenges to a conviction and sentence. Ind. Post-Conviction Rule 1(1)(b); *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013). The scope of potential relief is limited to issues unknown at trial or unavailable on direct appeal. *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012). "Issues available on direct appeal but not raised are waived, while issues litigated adversely to the defendant are *res judicata*." *Id.* The defendant bears the burden of establishing his claims by a preponderance of the evidence. P.-C.R. 1(5). When, as here, the defendant appeals from a negative judgment denying post-conviction relief, he "must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000). When a defendant fails to meet this "rigorous standard of review," we will affirm the post-conviction court's denial of relief. *DeWitt v. State*, 755 N.E.2d 167, 169–70 (Ind. 2001).

## Discussion and Decision

Gibson's IAC claim consists of several arguments, which we summarize and restate as follows: (I)(A) unreasonable delay in legal representation, which led to harmful self-incriminating statements; (I)(B) unreasonable delay in assembling a defense team and investigating evidence, which resulted in a deficient mitigation strategy throughout the proceedings; and (I)(C) failure to challenge certain evidence presented by the State as false, prejudicial, misleading, or unreliable. Gibson also argues (II) that trial counsel's uninformed advice prevented him from entering his guilty plea in *Gibson II* knowingly, intelligently, and voluntarily; as well as (III) that trial counsel—as Chief Public Defender of Floyd County—labored under a conflict of interest, placing the financial needs of his office above loyalty to his client.

We address each of these arguments in turn.

# I. Trial counsel was not ineffective.

To prevail on his IAC claims, Gibson must show (1) that his counsel's performance fell short of prevailing professional norms, **and** (2) that counsel's deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668 (1984). A showing of **deficient performance** under the first of these two prongs requires proof that legal representation lacked "an objective standard of reasonableness," effectively depriving the defendant of his Sixth Amendment right to counsel. *Overstreet v. State*, 877 N.E.2d 144, 152 (Ind. 2007) (citing *Strickland*). To demonstrate **prejudice**, the defendant must show a reasonable probability that, but for counsel's errors, the proceedings below would have resulted in a different outcome. *Wilkes*, 984 N.E.2d at 1240–41 (citing *Strickland*).

When assessing counsel's performance under *Strickland*, we rely on several important guidelines. First, we strongly presume that, throughout the proceedings, counsel exercised "reasonable professional judgment" and rendered adequate legal assistance. *Stevens v. State*, 770 N.E.2d 739, 746 (Ind. 2002) (citing *Strickland*). Second, defense counsel enjoys "considerable discretion" in developing legal strategies for a client, and this discretion demands deferential judicial review. *Id.* at 746–47. Finally, counsel's "[i]solated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." *Id.* at 747.

Beyond these broad directives, the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003) offer a digest of prevailing professional norms. This Court will often consult these **ABA Guidelines** in its analysis. *See, e.g., Ward*, 969 N.E.2d at 57 (applying the Guidelines in concluding "that the scope of counsel's investigation was reasonable"). At the same time, we view this source of authority as advisory in nature, "not as setting out rigid, detailed rules." *Weisheit v. State*, 109 N.E.3d 978, 998 n.2 (Ind. 2018) (Rush, C.J., dissenting in part). *See also Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) (quoting *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009)) (the Guidelines are not "'inexorable commands'").

## A. There was no unreasonable delay in legal representation.

The trial court appointed defense counsel to represent Gibson on April 24, 2012—the same day the State charged Gibson with the Whitis murder and four days after he first confessed to killing her and Hodella. Biggs received notice of his appointment on April 26, at which time he went to visit Gibson in jail.

Gibson argues that this delay in representation led him to make several self-incriminating statements to police, effectively defeating any leverage he held in negotiating a "non-death resolution of both cases." Appellant's GII Br. at 23–24. Counsel should have been aware of the cases sooner, he contends, because of the extensive media coverage surrounding his arrest for the murders. He quotes the ABA Guidelines in arguing that, "'barring exceptional circumstances,'" Biggs should have contacted him immediately following his arrest. Appellant's GI Br. at 20 (quoting ABA Guideline § 10.5(B)(1)); Appellant's GII Br. at 21 (quoting the same).

For the reasons below, we find no merit in this IAC claim.

As for deficient performance, Gibson fails to show that Biggs, prior to April 26, actually knew of his arrest, let alone the charges leveled against him. Biggs testified that he had **not** heard of the case through media reports before receiving notice of appointment from the New Albany Police Department. And, even if Biggs had learned of these events through the media, Gibson—referred to in the papers only "as a possible person of interest"—had already confessed to murdering Whitis and Hodella by the time published news reports circulated.[3] PCR Ex. Vol. 12,

---

[3] On April 20, 2012, the *Floyd County News and Tribune*, in reporting on the investigation of Whitis's death, referred to Gibson "as a possible person of interest in the case," adding that he "was arrested on preliminary charges of operating while intoxicated and resisting law enforcement." PCR Ex. Vol. 12, pp. 13–15. Two days later, the weekend edition of the *News and Tribune* reported on the continuing investigation, again referring to Gibson as a "possible person of interest in the case." *Id.* at 16, 20. That same issue, in reporting on Kirk's disappearance, simply referred to an unnamed "man" who, although "not a suspect," police had "been unable to locate." *Id.* at 18.

pp. 13–15. On top of that, the timely appointment of defense counsel rests with the trial court. *See Powell v. Alabama*, 287 U.S. 45, 71 (1932). Here, Biggs met with Gibson **the day before** the public defender's office received official notice of that appointment, immediately advising his client, "in the very strongest possible language," to stop talking to police. PCR Tr. Vol. I, p.15. Biggs then arranged for a hearing at which the court also advised Gibson of the potential consequences of his confessions to the police. These actions fall far short of deficient performance of counsel. *See* ABA Guidelines § 10.5(B)(1), (2) (urging defense counsel to contact the client within 24 hours of "entry into case").[4]

Gibson also fails to show prejudice. Indeed, even if Biggs could have acted sooner, Gibson offers no evidence or persuasive argument to show that intervention by counsel would have prevented him from confessing or that the outcome of the proceedings would have been different. Despite repeated *Miranda* warnings from police during his initial custody, Gibson never asked to speak with an attorney. And after receiving warnings from both Biggs and the trial court, Gibson—having signed a special advisement and waiver form—persisted in speaking with police **and** the media about his crimes. The privilege against self-incrimination ultimately belonged to Gibson, not his defense counsel. *See Owens v. State*, 431 N.E.2d 108, 110 (Ind. 1982) ("The purpose of the *Miranda* advisement is to make the suspect aware of his privilege against self-incrimination, right to counsel, and right to discontinue interrogation."). And Gibson knowingly and intelligently chose to waive that privilege.

---

[4] Even the capital defense expert Gibson relies on, when asked how soon he meets with a new client facing the death penalty, stated that it "depends [on] when [he] get[s] notice" of appointment. PCR Tr. Vol. III, p.173.

## B. We find no ineffectiveness, either at the pre-trial level or at sentencing, because of any delay by counsel in assembling the defense team.

Gibson faults trial counsel for unreasonable delay in assembling a defense team and in consulting with experts. This delay, he insists, (1) resulted in deficient pre-trial investigation, which, in turn, (2) thwarted the effectiveness of *voir dire*, (3) deprived him of leverage in negotiating a favorable plea, and (4) foreclosed any opportunity to pursue alternative mitigation theories at the sentencing phase.

### 1. Pre-Trial Investigation

Biggs started assembling his defense team almost immediately after his appointment. In late April (or early May) 2012, he contacted George Streib, a Floyd County public defender qualified to serve as co-counsel in capital cases. *See* Ind. Crim. R. 24(B)(2) (listing the qualifications for co-counsel in capital cases). Streib filed an appearance in June, serving as co-counsel in *Gibson I* until his replacement by Andrew Adams in November. Around the time he contacted Streib, Biggs also spoke with Mark Mabrey, an experienced investigator recommended by a leading capital defense attorney. Mabrey started work on the cases in late October 2012, a delay he attributed to his work in another capital case. Finally, in late September 2012, Biggs hired Michael Dennis, a mitigation specialist, who began work within a few days.

In addition to these key players, Biggs consulted with several mental-health experts. In late 2012, he hired an addictions expert and an expert on correctional systems. And several months later, in June 2013, Biggs—on the recommendation of the State Public Defender's Office—hired Dr. Edmund Haskins, a neuropsychologist, as a mental-health expert.

Despite these efforts, Gibson argues that, because trial counsel "failed to commence work on the case immediately" the resulting "delayed investigation fell below the prevailing professional norms." Appellant's GI Br. at 22, 26. As evidence of this alleged deficiency in representation,

Gibson cites the defense team's low number of billable hours following their retention.

We disagree and find no deficient performance.

First, our research reveals no caselaw (and Gibson cites none) finding IAC based on the **timing** of trial counsel's investigation. And we agree with one of our sister states that a "finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case." *State v. Lewis*, 838 So. 2d 1102, 1113 n.9 (Fla. 2002). We recognize the importance of counsel's prompt assembly of a defense team for a thorough and effective investigation. *See* ABA Guidelines § 10.4(C) (urging lead trial counsel, "as soon as possible" after appointment, to assemble a defense team); *id.* § 10.7(A) cmt. (noting that delayed investigation may affect "first phase defenses," decisions to consult with experts, and strategies in negotiating pleas). Here, however, we find no evidence of a deficient pre-trial investigation. Under the standard cited by Gibson, the "elements of an appropriate investigation" consist of (1) reviewing the charging documents; (2) searching for and interviewing potential witnesses; (3) acquiring information held by the prosecution or law enforcement, including any relevant physical evidence or expert reports; and (4) reviewing the crime scene. ABA Guidelines § 10.7(A) cmt.

A review of the record clearly shows that the defense team met this standard by the time Gibson first went to trial. During his time as co-counsel, Streib met with Gibson several times; he reviewed discovery, Gibson's statements to police, and his criminal record; and he prepared waivers, consulted with experts, and helped with jury selection. In the first two months of his investigation (even as the police investigation continued), Mabrey interviewed witnesses and reviewed discovery, photographs, autopsy evidence, charging information, and other documents. And during his first two months working the case, Dennis twice met with Gibson, conducted witness and record searches, reviewed documents and discovery, interviewed witnesses, prepared memoranda, and coordinated with Mabrey.

To be sure, the defense team encountered some setbacks in the investigation early on. Mabrey, for example, testified that his delay in the investigation made it difficult to locate some witnesses. And Streib added that, by the time they had arrived at Gibson's house, they "never really got to see the crime scene as it . . . originally was," leaving them only with photographs to reconstruct the scene. PCR Tr. Vol. I, p.122. But despite these setbacks, no one on the defense team testified that their belated involvement in the case precluded a meaningful investigation. To the contrary, as Biggs attested, the defense team "had everything that [they] should have had by the time [they] went to trial." PCR Tr. Vol. I, p.30.

Even if counsel's delays resulted in deficient pre-trial investigation, we find no prejudice. Gibson cites "lost" evidence from the crime scene and missing video footage from the jail "possibly" showing him talking to police. Appellant's GI Br. at 23; Appellant's GII Br. at 24–25. But he neglects to sufficiently explain what this evidence would have revealed, let alone how it would have changed the end result. *See Cross v. O'Leary*, 896 F.2d 1099, 1101 (7th Cir. 1990) (finding "no substantial likelihood that" alleged evidence, absent "sufficiently precise information," would have led to a different outcome). Pure speculation is simply not enough. *Id.*

## 2. Preparation for Jury Selection

Gibson next argues that trial counsel's delay thwarted the effectiveness of *voir dire*, leaving him with an unfavorable jury. As evidence of counsel's deficiency, Gibson cites (a) the undeveloped mitigation theme found in the juror questionnaires and (b) the delegation of questioning potential jurors to a single, inexperienced attorney.

We find neither deficient performance nor prejudice on either basis.

### a. Juror Questionnaires

Gibson faults trial counsel for neither conferring with mental-health experts nor retaining a jury consultant before finalizing the juror questionnaires. As a result, Gibson contends, the questionnaires lacked a

cogent mitigation theme necessary to solicit vital information from the potential jurors.

A juror predisposed to voting automatically for the death penalty, without considering mitigating evidence, deprives the defendant of a fair and impartial trial. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). And a "capital defendant may challenge for cause any prospective juror who maintains such views." *Id.* To help uncover potential juror bias, the ABA Guidelines urge defense counsel, with the assistance of an expert consultant, to "devote substantial time to determining the makeup of the venire, preparing a case-specific set of voir dire questions, planning a strategy for voir dire, and choosing a jury most favorable to the theories of mitigation that will be presented." ABA Guidelines § 10.10.2 cmt.

We find no deficiency in performance under these standards.

First, Dennis, the mitigation specialist, spent several hours reviewing the questionnaires in the week leading up to jury selection in *Gibson I*. And considering the evidence he had collected up to that point in the case—through over forty hours of discovery and document review, witness interviews, and expert consulting—Dennis, rather than one of the jury consultants, was arguably the most appropriate person to review the questionnaire and recommend any changes if necessary.

Second, the questionnaire itself explicitly posed **several** mitigation-related questions. In addition to surveying the venire panel's religious beliefs, education levels, and general opinions of the criminal justice system, the twenty-page document asked, among other things, (1) whether the potential juror favored or opposed the death penalty, (2) whether the manner of execution made a difference in shaping that view, (3) whether any particular crime warranted capital punishment, (4) whether the potential juror considered the death penalty effective in deterring crime, (5) whether a dangerous criminal should ever be shown mercy, (6) whether a criminal's mental capacity should influence the level of punishment, (7) whether courts should rely on the expert testimony of mental-health professionals, and (8) whether the potential juror would ever consider life in prison.

Once the venire panel completed the questionnaires, trial counsel analyzed the data to further refine the jury pool during *voir dire*. To assist with this process in *Gibson I*, Biggs hired local counsel, Doug Garner. In the week leading up to *voir dire*, Garner scored the questionnaires, drawing on his personal knowledge of Dearborn County and the potential biases of the local jury pool. And in *Gibson II*, Jodie English, a jury consultant with experience in capital cases, helped process the questionnaires collected from the venire panel, distilling each response into a "cheat sheet" for further questioning during jury selection. PCR Tr. Vol. 2, pp. 140–42. This process, English testified, assisted trial counsel in determining whether the potential jurors were "mitigation impaired, whether they were life sentence impaired, whether they were automatic votes for death, or whether they were automatic votes for life." *Id.* at 140-41. In short, the questionnaire formed part of a larger strategy in the jury selection process.

To be sure, some of the jury consultants criticized trial counsel for failing to incorporate their recommended questions. Inese Nieders, for example, would have asked about the potential jurors' opinions of sexual assault and of crimes against the elderly. But the trial court concluded that similar questions impermissibly exposed the jury pool to case-specific aggravators. While courts may permit the questioning of potential "jurors' biases or tendencies to believe or disbelieve certain things about the nature of the crime itself or about the particular line of defense," *Wisehart v. State*, 693 N.E.2d 23, 45–46 (Ind. 1998) (internal quotation marks omitted), counsel may not, as we held on direct appeal in *Gibson I*, pose questions that "seek to shape the favorable jury by deliberate exposure to the substantive issues in the case." 43 N.E.3d at 238 (internal quotation marks omitted). Even if these questions were permitted, trial counsel may well have sought to avoid them, for fear of emphasizing the depravity of Gibson's crimes. *See Bannowsky v. State*, 677 N.E.2d 1032, 1035 (Ind. 1997) (concluding that defense counsel's "desire to avoid focusing [prospective]

jurors' attention upon [certain] questions" during *voir dire* was reasonable trial strategy).[5]

Because the questionnaires adequately covered the primary areas of mitigation and because Gibson fails to describe how they should have been changed, we find no deficiency in the performance of his counsel. *See United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011) ("So long as counsel's reasons for not questioning [a potential juror] further were not so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient.") (internal quotation marks omitted).

Gibson also fails to show prejudice. While citing the purportedly pro-death views of several empaneled jury members, as reflected in their questionnaire answers, Gibson overlooks their "assurances of impartiality," as this Court expressly found on direct appeal in *Gibson I*. 43 N.E.3d at 240.

## b. Delegation of Questioning to Co-Counsel

Gibson also faults trial counsel for delegating the questioning of jurors exclusively to co-counsel: Streib in *Gibson I* and Adams in *Gibson II*. As evidence of IAC, Gibson cites counsel's deviation from the "Colorado Method" of jury selection[6] and counsel's failure to strike for cause several prospective jurors with strong pro-death penalty views.

---

[5] Gibson also argues that trial counsel proved ineffective for failing to amend the juror questionnaire in preparation for *Gibson II*. This argument is equally unavailing. Even if circumstances warranted revision, Gibson fails to explain what those circumstances were, and we find no significant difference between the two cases.

[6] The Colorado Method of capital jury selection applies several basic principles: (1) selection of jurors based on their life and death views only; (2) attempts to remove pro-death jurors using for-cause challenges while retaining jurors potentially favoring life; (3) questioning of pro-death jurors about their ability to respect the decisions of the other jurors; and (4) prioritization of peremptory challenges based on the prospective jurors' views on punishment. Matthew Rubenstein, *Overview of the Colorado Method of Capital Voir Dire*, Champion, Nov. 2010, at 18.

Again, we find no deficient performance.

First, both Streib and Adams received training in the Colorado Method of jury selection, making them the most qualified defense attorneys to handle this part of the case. *See* ABA Guideline § 10.10.2 (stating that counsel "should be familiar" with techniques to qualify a capital jury). To be sure, some members of the defense team spoke of their concerns over co-counsel's performance. For example, Garner (local counsel employed by Biggs) testified that Streib, while "reasonably effective" when jury selection began, ultimately "got worn down, and became less effective as the days went on and the days got later and later." PCR Tr. Vol. III, p.81. Streib was "clearly tired, fatigued, and stressed," Garner added, and "was less able to effectively resist the prosecutor's attempts to challenge persons for cause." *Id.*, p.82. English, the jury consultant, lodged similar criticisms against Adams, faulting him for not asking certain follow-up questions and other "radical deviations from the [Colorado] method." PCR Tr. Vol. II, p.145. But even if co-counsel deviated from their training, and even if they could have been "a little bit more aggressive" in their questioning, as Garner opined, PCR Tr. Vol. III, pp. 100–01, we find no evidence that they acted deficiently. As Garner himself acknowledged, "everybody does things differently" when applying the Colorado method. *Id.*, p.80.

Second, while they may have been the only ones interacting directly with the jury, both Streib and Adams testified to having the full support of the defense team. Gibson's claim to the contrary draws upon select portions of the record, painting a highly-subjective narrative that fails to accurately reflect trial counsel's strategy during jury selection. Indeed, even those critical of co-counsels' performance acknowledged the defense team's support. Garner, for example, testified to having sat with Streib at counsel table during jury selection, offering hypothetical questions to gauge the jury's response, and recommending which jurors to strike. "[W]hen the round of questioning was done," he stated, "everybody would put their heads together." PCR Tr. Vol. III, p.94.

Even if co-counsel fell short of prevailing professional norms in their questioning of jurors, Gibson fails to show prejudice. Indeed, other than faulting co-counsel for deviating from certain methods and for failing to

strike certain prospective jurors for cause, he points to no particular action that would have resulted in a different outcome. And "bald assertions of prejudice" don't satisfy the defendant's burden under *Strickland*. *Timmons v. State*, 500 N.E.2d 1212, 1217 (Ind. 1986).

### 3.  Plea Negotiations

Soon after the State filed its death-penalty allegation in *Gibson I*, Biggs approached the prosecution in an effort to negotiate a plea sparing Gibson's life. But the prosecutor was "adamant" in seeking the death penalty, and Biggs made no further effort to negotiate a reduced plea in either case. PCR Tr. Vol. I, p.25.

Gibson argues that, regardless of the prosecutor's initial response, trial counsel had a continuing duty to negotiate a favorable plea "at all phases" of litigation. Appellant's GI Br. at 28; *See* ABA Guidelines § 10.9.1(E) ("[I]nitial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate."). "Had counsel conducted the necessary investigation and consulted with the appropriate experts," Gibson adds, "there is a reasonable probability that [the] parties would have reached an agreed-upon resolution sparing Gibson the death penalty." Appellant's GI Br. at 29.

While there is no constitutional right to a plea offer, criminal defendants are entitled to "effective counsel during plea negotiations." *Missouri v. Frye*, 566 U.S. 134, 144 (2012). Here, however, we find no deficient performance. The ABA Guidelines urge defense counsel to persevere in negotiations despite the prosecutor's initial refusals, but the persistence of counsel depends on changing circumstances over the course of the proceedings. *See* ABA Guidelines § 10.9.1 cmt. Gibson points to no change in circumstances that would have prompted trial counsel to renegotiate a plea deal. To the contrary, as the investigation unfolded, the overwhelming evidence revealed the horrific nature of Gibson's crimes, effectively depriving trial counsel of any leverage in seeking a reduced sentence.

Even if Biggs had attempted to negotiate a more favorable plea agreement, we find no prejudice, as Gibson fails to show that he would have accepted an offer had one been made—let alone that the prosecution would have kept that offer on the table. *See Lafler v. Cooper*, 566 U.S. 156, 164 (2012) (a finding of prejudice requires the defendant to show that he "would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances"). In fact, the record reveals Gibson's apparent preference for the death penalty—a preference that manifests itself in his statements to police and the media and in the "Death Row X 3" tattooed on the back of his head. *See* GII DA App. Vol. 4, p.749. As Biggs testified, "all along Mr. Gibson just kind of wanted to get things over with," that is, he "just wanted to go ahead, admit everything, and take the death penalty." PCR Tr. Vol. I, p.74.

## 4.   Presentation of Mitigating Evidence at Sentencing

Gibson next argues that trial counsel's "dilatory representation from the case's inception" left him with a futile mitigation defense at sentencing. Appellant's GI Br. at 35; Appellant's GII Br. at 29.

The Sixth Amendment entitles capital defendants to the effective assistance of counsel at the penalty phase of trial. *See, e.g., Rompilla v. Beard*, 545 U.S. 374 (2005); *Smith v. State*, 547 N.E.2d 817 (Ind. 1989). This includes the investigation and presentation of mitigating factors that may reduce the defendant's sentence. *Porter v. McCollum*, 558 U.S. 30, 40 (2009); *Ward*, 969 N.E.2d at 56. While the failure to meet this duty may result in IAC, trial counsel need not investigate "every conceivable line of mitigating evidence." *Ritchie v. State*, 875 N.E.2d 706, 719 (Ind. 2007). Rather, "counsel has a duty to make a reasonable investigation or to make a reasonable decision that the particular investigation is unnecessary." *Id.* at 719–20. And the strategic decision to present or not to present the fruits of that investigation at trial enjoys broad judicial deference. *Id.* at 720. Ultimately, our concern is whether the investigation supporting that decision is reasonable, "not whether counsel should have presented more in mitigation." *Id.*

Here, trial counsel's mitigation theory in *Gibson I* focused largely on Gibson's history of drug and alcohol abuse, his dysfunctional childhood, his family's history of mental illness and the negative effect of his mother's recent death. Trial counsel also presented evidence of Gibson's hobbies and mechanical skills, the friendly relationships he forged with his neighbors, and his generally good behavior in prison. This narrative emerged from the defense team's extensive review of Gibson's medical history and the opinions of several experts.

With evidence that Gibson had sustained multiple concussions in the past, trial counsel ordered an MRI to assess Gibson for possible brain damage. Dr. Victor Matibag, a neurologist, reviewed the MRI, ultimately finding no evidence of brain damage. Dr. Haskins, a neuropsychologist and expert on traumatic brain injuries, likewise found no sign of major cognitive impairment, concluding that Gibson suffered from bipolar, anti-social personality, and borderline-personality disorders. At trial, he testified to the effect of these disorders on Gibson in relation to his history of drug and alcohol abuse.

In addition to these experts, the defense team presented several lay witnesses to support its mitigation theory at sentencing. Brenda Ray, Gibson's half-sister, testified to their childhood, their family history of mental illness and substance abuse, and their brother's suicide. George Johnson, a correctional officer, attested to Gibson's suicide attempt and emotional state during his incarceration. And Thomas Wesley, Gibson's neighbor, spoke of Gibson's help with home maintenance, the time they spent repairing motorcycles, and Gibson's dramatic change in personality following his mother's death.

With certain exceptions, trial counsel generally stuck with the same mitigation theory and witnesses in *Gibson II*. Dr. Barry Hargan, a psychologist, testified to Gibson's history of substance abuse. And Dr. Heather Henderson-Galligan, who replaced Dr. Haskins, testified to her diagnosis of Gibson's bipolar disorder.

Despite these efforts, Gibson argues that trial counsel ineffectively presented mitigating evidence at sentencing. He specifically faults counsel for failing to secure important lay witnesses and for failing to present his

complete medical history—including the 2013 MRI—to a qualified mental-health expert. As evidence of deficient performance, Gibson points to the allegedly stronger testimony of Dr. Andrew Chambers, an expert in addictions psychiatry who first testified at the post-conviction hearing. As with Drs. Haskins and Henderson-Galligan, Dr. Chambers diagnosed Gibson with bipolar disorder, anti-social personality disorder, and drug and alcohol abuse. But, in deviating from his expert counterparts at the trial level, Dr. Chambers—based on his review of the MRI and other medical records—concluded that Gibson suffered from a possible traumatic brain injury. This injury, traced to a 1991 car accident, allegedly went "grossly undertreated" over the years, exacerbating Gibson's mental illness and substance abuse problems. PCR Ex. Vol. 18, p.24. Two lay witnesses—Gibson's ex-wife, Kelly Fey, and John Carroll, a criminal defense attorney who represented Gibson on sexual battery charges in 1991—corroborated this theory, testifying to Gibson's deterioration in mental health after the accident. This deterioration, Dr. Chambers explained, left Gibson with a "very disturbed and dysfunctional brain," ultimately leading to impulsive criminal behavior devoid of "strategic premeditation." PCR Ex. Vol. 18, pp. 15, 16.

This post-conviction testimony, Gibson insists, "presented a much more accurate and compelling description of [his] addictive and psychiatric conditions" than that offered at sentencing. Appellant's GI Br. at 46. Had trial counsel uncovered and presented this readily-available evidence, he contends, there is a reasonable probability the court would have spared him the death penalty.[7]

We disagree and find no deficient performance of counsel.

_____

[7] In determining whether to impose a death sentence or a sentence of life imprisonment without parole, a court may consider several mitigating circumstances under Indiana Code section 35-50-2-9(c). Gibson argues that the post-conviction testimony supports two of these circumstances: (1) that he "was under the influence of extreme mental or emotional disturbance when the murder was committed" and (2) that his "capacity to appreciate the criminality of [his] conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication." *See* I.C. § 35-50-2-9(c)(2), (6).

First, there is no evidence that the experts at trial received inadequate information to conduct their analyses or to form their opinions. Dr. Haskins reviewed volumes of Gibson's medical records—from Floyd Memorial Hospital, from Madison State Hospital, from Richmond State Hospital, from the Kentucky Department of Corrections, and from the Army. And while the record doesn't show whether he reviewed the 2013 MRI, Dr. Haskins conducted a "battery" of neuropsychological evaluations in forming his assessment. GI DA Tr. Vol. XV, pp. 3630, 3636, 3649.

Dr. Hargan, in turn, met with Gibson to assess his level of alcohol and drug dependence. In preparation for the interview, Dr. Hargan reviewed Dr. Haskins's evaluation, Gibson's medical records from the Madison State Hospital, and a discharge summary from another hospital visit. Because of the limited scope of his investigation, he testified, these documents—along with background information he collected on Gibson's family history, childhood, education, employment, and military experience—provided Dr. Hargan with "enough information" to conduct his assessments. GII DA Tr. Vol. IV, pp. 1024, 1027.

For her part, Dr. Henderson-Galligan reviewed Gibson's medical records from Richmond State Hospital and Madison State Hospital. She also interviewed Gibson, observing his behavior and collecting background information on his mental health and other aspects of his life. This information, she testified, likewise proved sufficient in forming the basis of her diagnosis.

Second, while evidence of brain damage resulting in impulsive, violent behavior is certainly relevant to a defendant's moral culpability, *see Porter*, 558 U.S. at 36, 41, there's nothing to **conclusively** establish the existence of a TBI. Indeed, neither of the trial experts—Dr. Haskins or Dr. Matibag— found evidence of brain damage. And Dr. Chambers himself acknowledged that "just because an individual sustains a head injury does not mean that they've sustained a brain injury." PCR Ex. 94D, Vol. 18, p.62. What's more, he added, even a brain injury can heal over time—the length of recovery depending on the level of severity. Absent evidence of impaired cognition, trial counsel may reasonably have decided that a head

injury sustained nearly three decades ago simply wasn't worth investigating further. And while Gibson's mental health and addiction issues may have escalated in the intervening years, he also lived a relatively normal life during this period—fixing motorcycles, creating artwork, and helping neighbors with home maintenance and repair. Trial counsel would have had a difficult time reconciling these facts with a theory attributing Gibson's violent criminal behavior to a concussion sustained thirty years ago, especially with evidence of Gibson's normal neurocognitive functioning. The recent death of Gibson's mother, on the other hand, presented trial counsel with a viable mitigation theory with supporting testimony from several lay witnesses. *See Stevens*, 770 N.E.2d at 746–47 (defense counsel enjoys considerable discretion in developing legal strategies for his client).

Finally, trial counsel had no reason to question the qualifications of the experts he employed; they came highly recommended by respected criminal defense attorneys and nothing suggests that they were wrong in their assessments. While Gibson suggests that Dr. Matibag was unqualified in evaluating the MRI for signs of brain damage, he fails to specify who counts as a "qualified expert" to conduct this analysis, let alone how Dr. Chambers—an addictions psychiatrist—was any more qualified than Dr. Matibag. To the extent the expert opinions conflict, such disagreement does not establish IAC in the investigation and presentation of mitigating evidence. *See Conner v. State*, 711 N.E.2d 1238, 1256 (Ind. 1999) (observing that mental-health professionals "disagree widely and frequently on what constitutes mental illness [and] on the appropriate diagnosis to be attached to a given behavior and symptoms").

In short, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face . . . or would have been apparent from documents any reasonable attorney would have obtained." *Bobby*, 558 U.S. at 11. Rather, trial counsel's "decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments." *Id.* (internal quotation marks omitted). *Cf. Patrasso v. Nelson*, 121 F.3d 297, 303–05 (7th Cir. 1997) (counsel's performance at sentencing was "practically non-existent");

*Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991) (holding that defense counsel's failure to investigate his client's psychiatric history before sentencing phase of trial amounted to IAC).

Even if trial counsel should have investigated further, Gibson fails to show prejudice. In assessing prejudice, we ask whether there is a reasonable probability that, but for counsel's errors, the sentencing court "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Here, the sentencing court faced four significant death-qualifying aggravators in each case. Gibson committed three murders in the span of about a decade, two he committed while on probation and which included extremely violent sexual assaults, and one which involved dismemberment. Given the severity of these aggravators, we are not persuaded that the jury in *Gibson I*, or the judge in *Gibson II*, would have imposed anything less than a sentence of death. Indeed, a "few more tidbits from the past or one more diagnosis of mental illness on the scale would not have tipped it in [Gibson's] favor." *Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996); *see also Weisheit*, 109 N.E.3d at 995.

## C. Trial counsel was not ineffective for failing to raise specific challenges at the guilt phase.

Gibson raises several IAC claims related to the guilt phase of his proceedings, namely counsel's failure to challenge (1) his allegedly coerced statements to police, (2) the allegedly false testimony from a State witness, (3) an allegedly prejudicial victim-impact statement, and (4) an alleged *Caldwell* error.

A decision to object or not to object is a matter of trial strategy, and counsel is presumed to have acted effectively in making the decisions. *Myers v. State*, 33 N.E.3d 1077, 1099 (Ind. Ct. App. 2015). To establish IAC in this context, "a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure." *Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001).

## 1. Statements to Police

Statements to police are admissible so long as they are voluntarily given. *Pruitt v. State*, 834 N.E.2d 90, 115 (Ind. 2005). In determining whether a confession was voluntary or coerced, we look to the circumstances surrounding the interrogation. *Id.*

Here, Gibson complains of the detectives' use of coercive techniques during his post-arrest interrogation, rendering his confessions false and unreliable. In support of this argument, he cites his vulnerability to manipulation and points to several statements he made about other putative victims that ultimately proved untrue. Gibson raises this claim not to contest his underlying guilt but to challenge the evidence used from his confessions at the sentencing phase.

We find no deficient performance, as Gibson fails to persuade us that the trial court would have sustained any objection to the admissibility or reliability of his statements.

First, the record shows that Gibson's statements were voluntary. Before each interrogation, the interviewing detective advised Gibson of his *Miranda* rights. And each time, Gibson waived those rights, persistently agreeing to speak with police about his crimes despite advice to the contrary from both trial counsel and the court. When asked whether Gibson seemed "capable of waiving his right to counsel and other *Miranda* rights," Biggs responded in the affirmative, testifying that Gibson "seemed very composed" and "very at ease" and that "he just wanted to get it all over with." PCR Tr. Vol. I, p.59. Co-counsel Adams likewise testified that Gibson's recorded statements to police appeared "knowingly . . . free [and] voluntary."[8] PCR Tr. Vol. I, p.168.

What's more, a challenge to Gibson's police confessions would have forced counsel to confront at trial the incriminating statements Gibson

---

[8] We likewise find the testimony of Gibson's expert on false confessions unpersuasive, as that testimony criticized only two tactics used by the police—minimization and leading questions—neither of which suggested coercion.

made to the media **without** evidence of coercion. We agree with the post-conviction court that the "defense's credibility would have been endangered by attempting to challenge these statements in light of corroborating evidence." Appellant App. Vol. III, pp. 24–25. *See Hardamon v. United States*, 319 F.3d 943 (7th Cir. 2003) (failure to object to damaging testimony by witness was reasonable trial strategy, since an objection would have called additional attention to the statements).

The evidence also contradicts the idea that Gibson was vulnerable to police coercion. To the contrary, it was Gibson—not the police—who consistently used "manipulative tactics" throughout the investigation. *Gibson II*, 51 N.E.3d at 208–09. As Detective Carrie East explained, because Gibson "had all the information" on his victims, he controlled the interviews, agreeing to reveal certain facts in exchange for a cigarette break, a coffee break, or other perks. PCR Tr. Vol. II, pp. 234–35.

Gibson's tactics also explain the false statements he made about other putative victims. As Biggs testified, Gibson consistently maintained "that the statements he gave about Ms. Hodella, Ms. Whitis, and Mrs. Kirk were true, that they were the **only** murders he had committed." PCR Tr. Vol. I, pp. 26–27, 50 (emphasis added). By confessing to the other alleged murders, Gibson deliberately misled police, sending "them on a number of wild goose chases . . . just to get out of his cell, just to drive around." *Id.*, pp. 26–27.

Even if trial counsel should have challenged Gibson's statements to police, we find no evidence of prejudice. Substantial independent evidence of Gibson's guilt confirms the truth of his admissions. Police found Whitis's corpse in Gibson's garage and, in the hours after her body was discovered, they apprehended Gibson, who was driving her van with the severed breast in the console.

In short, Gibson shows neither deficient performance nor a reasonable probability of a different outcome had he challenged the admissibility of his statements. As trial counsel testified, because they "had three bodies to corroborate the confessions," they "couldn't challenge them as being false confessions." PCR Tr. Vol. I, p.53.

## 2. Testimony from State Witness

At trial in *Gibson I*, one of the State's witnesses—a detective—testified to certain inconsistencies in Gibson's statements. These inconsistencies left a 24-hour gap during which Gibson may have held Whitis against her will before killing her. The detective also suggested that Gibson may have bound his victim using duct tape. Gibson attacks this testimony as false and argues that trial counsel acted deficiently by failing to object. As with his preceding IAC claim, Gibson concedes lack of prejudice at the guilt phase, arguing instead that counsel's deficient performance resulted in prejudice at sentencing.

A conviction based on the State's knowing use of false evidence violates a defendant's Fourteenth Amendment right to due process. *Giglio v. United States*, 405 U.S. 150, 153–55 (1972). Here, however, we find no proof of false testimony. The detective simply attested to the discrepancies between Gibson's statements and the physical evidence, suggesting Whitis may have endured an extended attack before dying. Indeed, the medical examiner found massive blunt force trauma to the victim's head, extensive bruising on her arms, and evidence that she had been sexually assaulted while still alive. This evidence tends to justify the detective's skepticism that Whitis died quickly. And Gibson himself acknowledges that the detective's "assertions were speculation." Appellant's GI Br. at 51. An objection by trial counsel on grounds of false testimony would not have been sustained. *See Wrinkles*, 749 N.E.2d at 1192 ("[T]o prove ineffective assistance of counsel due to the failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure.").

Gibson also fails to show deficient performance because trial counsel confronted the detective on cross-examination with evidence—namely, inconclusive DNA analysis of the duct tape—that contradicted the detective's tentative conclusions. Rather than lodging a preemptive objection to the detective's speculative testimony, trial counsel strategically challenged the witness on cross examination with conflicting evidence.

We likewise find no prejudice. Gibson contends that the prosecutor adopted the detective's false testimony in closing arguments "'in a manner calculated to inflame the passions or prejudice of the jury.'" Appellant's GI Br. at 53 (quoting *Neville v. State*, 976 N.E.2d 1252, 1264 (Ind. Ct. App. 2012), *trans. denied*). But those arguments—that Gibson sexually assaulted Whitis, "then killed her, and then . . . kept her in [his garage] for 24 hours or so"—simply reflect the facts of the case. GI DA Tr. Vol. XV, pp. 3416–17. *See Cooper v. State*, 854 N.E.2d 831, 837 (Ind. 2006) (the prosecutor may present a "fair commentary on the facts introduced at trial"). The prosecutor never stated that Gibson bound Whitis for an extended period of time. And even if there were such an implication, the severity of Gibson's crime—involving an extremely violent sexual assault and dismemberment—outweigh any prejudice.

### 3. Victim-Impact Statements

In both its opening and closing arguments during the guilt phase in *Gibson I*, the prosecution discussed how Whitis had enjoyed spending time with her children and grandchildren, that she was "active," "healthy," and "vibrant" and showed love "not just to her family, but to her friends" as well. GI DA Tr. Vol. XII, pp. 2697, 3447–48. These statements, Gibson contends, improperly influenced the jury by eliciting emotion and sympathy. Had trial counsel objected, he insists, the court would have sustained the objection.

Generally, courts allow the introduction of victim-impact statements to demonstrate the "consequences suffered by a victim or a victim's family as a result of a crime." *Laux v. State*, 985 N.E.2d 739, 749 (Ind. Ct. App. 2013), *trans. denied*. But this evidence is generally prohibited in a capital case, unless relevant to an aggravating or mitigating circumstance. *Bivins v. State*, 642 N.E.2d 928, 956–57 (Ind. 1994).

Here, the prosecutor appears to have offered these statements not as evidence but as an argument, likely to show that Gibson exploited the care and affection of a family friend for his own deviant ends. *See Piatek v. Beale*, 999 N.E.2d 68, 69 (Ind. Ct. App. 2013) (noting that the "arguments of counsel are not evidence"), *trans. denied*. And trial counsel could

reasonably have abstained from objecting to these statements to avoid the appearance of insensitivity or to avoid drawing more attention to the underlying facts. *See Pennycuff v. State*, 745 N.E.2d 804, 812 (Ind. 2001) (counsel's decision to waive "perfunctory objections having little chance of success or no direct or substantial relationship to the main thrust of the defense is within the realm of reasonable trial strategy") (internal quotation marks omitted); *Myers*, 33 N.E.3d at 1103 (finding no deficient performance when counsel failed to object "to avoid drawing unfavorable attention" to certain facts).

Even if we were to characterize the prosecutor's statements as evidence, Gibson fails to prove prejudice. The jury received instructions to disregard counsel's unsworn statements and "only consider testimony and evidence . . . [that] comes from the witness stand from a witness placed under oath." GI DA Tr. Vol. III, p.576. *See Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) (juries are presumed to follow instructions). And to the extent the jury ignored these instructions, the prosecutor's statements likely had little, if any, effect on the jury, considering the overwhelming evidence of Gibson's guilt. *See Cooper v. State*, 687 N.E.2d 350, 353–54 (Ind. 1997) (relying on "overwhelming evidence of guilt" in finding no prejudice when defense counsel failed to object to victim-character evidence); *Lambert v. State*, 675 N.E.2d 1060, 1065 (Ind. 1996) (reciting the rule that an "evidentiary error is harmless" if its probable impact on the jury, "in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties"). And the admission of facts about a victim that "does no more than state the victim's status in life" is no grounds for reversible error. *Burris v. State*, 642 N.E.2d 961, 966 (Ind. 1994).

### 4. *Caldwell* Error

In capital cases, Indiana law imposes on the jury a duty to "recommend to the court whether" the defendant should receive "the death penalty or life imprisonment without parole, or neither." I.C. § 35-50-2-9(e). And "[i]f the jury reaches a sentencing recommendation, the court **shall** sentence the defendant accordingly." *Id.* (emphasis added).

In its preliminary and final instructions during the penalty phase of *Gibson I*, the trial court informed the jury that, in weighing the aggravating and mitigating factors, it "**may** recommend the sentence of death or life imprisonment without parole." GI DA Tr. Vol. XV, p.3486; DA GI Tr. Vol. XVI, p.3808 (emphasis added). These instructions, Gibson argues, improperly suggested to the jurors that their recommendations were merely "advisory in nature" rather than binding, as the law requires. Appellant's GI Br. at 58–59 (internal quotation marks omitted). The prosecutor compounded this error, Gibson contends, by emphasizing to the jury in closing arguments that he "shar[ed the] responsibility" in deciding Gibson's fate, having "signed the charging document [and] death penalty papers." *See* GI DA Tr. Vol. XVI, p.3788. Had the jury understood the binding nature of its recommendation, Gibson argues, "there is a reasonable likelihood it would have voted against death." Appellant's GI Br. at 59.

Under *Caldwell v. Mississippi*, a statement to the jury that diminishes its sense of responsibility for imposing a death sentence is constitutionally impermissible. 472 U.S. 320, 328–29 (1985).[9] The purpose of this rule is to avoid "creating the mistaken impression" that a higher court, despite "the limited nature of appellate review," makes the final and "authoritative determination of whether death was appropriate." *Id.* at 343 (O'Connor, J., concurring in part and concurring in the judgment). *Caldwell* errors apply only to instructions, argument, or evidence that is inaccurate and misleading. To prove such an error, a defendant "must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989).

Here, "the jury was not affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Rather, the

---

[9] In *Caldwell*, the prosecutor argued to the jurors that their decision was "not the final decision" because the case would be reviewed by a higher court on appeal. 472 U.S at 325. Caldwell appealed his death sentence, arguing that the prosecutor's comments diminished the constitutional responsibility placed on the jurors as the ultimate deciders of his fate. *Id.* at 325–26.

prosecutor simply made a factual assertion that he shared in the responsibility of determining the appropriate sentence since he was the one who sought the death penalty to begin with. In other words, had the prosecutor never filed the death-penalty allegation, the dilemma of whether to impose that sentence would never have presented itself to the jury. Nothing in the prosecutor's statements qualified the jury's role in sentencing Gibson. To the contrary, he recognized the heavy burden placed on each of the jurors, "in no way want[ing] to diminish" their "difficult" role in deciding Gibson's fate. GI DA Tr. Vol. XVI, p.3788. What's more, the prosecutor made no indication—either expressly or implicitly—that the ultimate determination of death lies with an appellate court. *See Caldwell*, 472 U.S. at 325.

Even if the prosecutor's comments were objectionable, the trial court informed the jury—in both its preliminary and final instructions—that the "law requires that your sentencing recommendation must be followed by the Judge" and that the "Judge must follow your sentencing recommendation." GI DA Tr. Vol. XVI, p.3814; GI DA Tr. Vol. XV, p.3486. And "[w]hen the jury is properly instructed, we will presume they followed such instructions." *Weisheit*, 26 N.E.3d at 20 (internal quotation marks omitted). To the extent these instructions proved insufficient, as Gibson suggests, defense counsel's arguments in closing—emphasizing the "the decision [the jury] will have to make" as to life or death—cured any confusion over the binding nature of the jury's sentencing recommendation. GI DA Tr. Vol. XVI, p.3792.

For these reasons, we find neither deficient performance nor prejudice from trial counsel's failure to object to the court's jury instructions or the prosecutor's closing arguments.[10]

---

[10] Because Gibson fails to show deficient performance at the trial level, we decline to address his argument that appellate counsel was ineffective for failing to raise the unpreserved *Caldwell* claim on direct appeal. *See Woods v. State*, 701 N.E.2d 1208, 1221 (Ind. 1998) ("[I]neffective assistance of appellate counsel requires the petitioner to overcome the double presumption of attorney competence at both trial and appellate levels.").

## II. Gibson's guilty plea with open sentencing was knowing, intelligent, and voluntary.

On the second day of voir dire in *Gibson II*, the prosecutor approached defense counsel to ask whether Gibson would consider, in lieu of a jury trial, pleading guilty to the Kirk murder while leaving sentencing to the court's discretion. The prosecutor also offered to dismiss the habitual-offender enhancement. After a "lengthy discussion," the defense team presented the offer to Gibson, outlining the "pros and cons" of the plea. PCR Tr. Vol. I, pp. 179–80. Biggs and Adams, while "ma[king] it clear [to Gibson] that it was his decision," urged him to accept the plea, opining "that it would be better to take his chances with the Judge" rather than with the jury. *Id.* at 73–74.

This advice, Gibson contends, amounted to IAC. "The prevailing professional norm," he insists, "is to avoid, if at all possible, pleading a capital client guilty with the death penalty as a sentencing option." Appellant's GII Br. at 67–68 (citing ABA Guidelines § 10.9.2). Further, he insists, trial counsel's uninformed advice—given the inadequate investigation of mitigating evidence—prevented Gibson from entering his plea intelligently and voluntarily, rendering it void as a violation of due process.

A valid guilty plea depends on "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (internal quotation marks omitted). IAC claims alleging invalid guilty pleas based on trial counsel's flawed advice turn on the same two-part test outlined in *Strickland*. *Id.* at 57.

Under the **performance** prong, "the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Lockhart*, 474 U.S. at 56 (internal quotation marks omitted). Here, the evidence supports the conclusion that trial counsel met this standard.

In weighing whether Gibson should plead guilty, Biggs recognized the detrimental effect that the gruesome photos of Ms. Whitis' corpse had

played in the outcome of *Gibson I*. Counsel clearly wanted to avoid the same effect in *Gibson II*. Biggs also considered that the judge had never sentenced someone to death without a binding jury recommendation. "We didn't know what the Judge would do," he testified, "but we felt virtually certain that that jury was going to impose the death penalty." PCR Tr. Vol. I, p.75 Co-counsel Mabrey expressed similar sentiments, concluding that, because of the death sentence already imposed in *Gibson I*, the judge "might consider" a life sentence instead. PCR Tr. Vol. III, p.134.

While "counsel should be extremely reluctant" to plead a capital client guilty with open sentencing, the choice ultimately is for the client to make and "counsel's role is to ensure that the choice is as well considered as possible." ABA Guidelines § 10.9.2 cmt. The deliberation here shows that trial counsel carefully considered their options. While "ma[king] it clear [to Gibson] that it was his decision," they believed Gibson stood a greater chance of avoiding a second death sentence by pleading before a detached and unbiased trial judge, rather than a highly-impressionable jury. PCR Tr. Vol. I, p.74.

Still, Gibson points to critical testimony from some members of the defense team as evidence of deficient performance. Co-counsel Adams, for example, "thought that the Judge would probably give [Gibson] death." PCR Tr. Vol. II, p.181. Likewise, Dennis was "adamantly opposed" to the plea and English thought it was "a terrible idea." PCR Tr. Vol. II, pp. 156, 159–60. But, as with other arguments posed by Gibson, this narrative paints only a partial picture of the defense team's deliberations. As Biggs testified, even English acknowledged the "lousy jury." PCR Tr. Vol. I, p.75. And while Adams believed it was likely that the trial court would impose a death sentence, he concurred with Biggs's assessment that the potential jurors were "very antithetical" to Gibson, and considerably more unfavorable than those picked in *Gibson I*. PCR Tr. Vol. I, pp. 69–70, 72, 179–80.

Even if trial counsel's advice were deficient, Gibson fails to show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474

U.S. at 59. He simply insists that, but for counsel's deficient advice, he would have proceeded to trial.[11] But a defendant's alleged propensity to heed his attorney's advice, without more, falls short of the prejudice standard. Gibson never testified—or even appeared—at his post-conviction hearing, and he never indicated the motivations for his guilty plea.

## III. Trial counsel operated under no conflict of interest.

Finally, Gibson argues that his cases proceeded under a conflict of interest, the loyalties of trial counsel divided between Gibson himself and the Floyd County Public Defender's Office. Effective legal representation in a resource-consuming capital case, Gibson contends, stands irreconcilably at odds with trial counsel's duty, as Chief Public Defender, to ensure the efficient administration of public funds. As evidence of this conflict, Gibson cites several of the alleged deficiencies in representation discussed above. He also points to a proposed 2013 amendment to Criminal Rule 24. Drafted by the Indiana Public Defender Commission, that amendment would have prohibited the appointment of a chief public defender to a capital case. *See* PCR Ex. Vol. 12, pp. 8–10.

---

[11] Gibson characterizes the prosecutor's proposal as a mere "suggestion" rather than a formal plea offer, the implication being that trial counsel should never have presented it to Gibson for consideration to begin with. Appellant's GII Br. at 63 (citing *Schmid v. State*, 972 N.E.2d 949, 953–54 (Ind. Ct. App. 2012) (counsel's failure to communicate a "possible compromise" with no firm written offer did not amount to IAC)). But this point is a non sequitur, as counsel's advice to plead guilty—whether prompted by the prosecutor's offer (or suggestion) or by the defense team's own strategic reasoning—fell within the realm of effective assistance of counsel. Furthermore, the ABA Guidelines on which Gibson relies specifically urge counsel to "inform the client of any **tentative** negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages, disadvantages and potential consequences of the agreement." ABA Guidelines § 10.9.2(D) (emphasis added). That's precisely what counsel did here.

## A. The standard *Strickland* analysis applies to Gibson's conflict-of-interest claim.

The constitutional right to effective assistance of counsel includes representation free from conflicts of interests. *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citations omitted). A conflict-of-interest claim is a category of an IAC claim. *Strickland*, 466 U.S. at 692. But, unlike in traditional IAC challenges, a defendant generally need not show prejudice to prevail in a conflict-of-interest claim. *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980). Rather, a limited presumption of prejudice applies when the defendant shows "that an actual conflict of interest adversely affected his lawyer's performance."[12] *Id.* at 348. The reason for this presumption stems in part from the difficulty of measuring the precise effect the conflict has on counsel's representation. *Strickland*, 466 U.S. at 692.

Conflict-of-interest claims typically arise when counsel represents multiple defendants in the same case. *See* Wayne R. LaFave et al., 3 Crim. Proc. § 11.9(a) (4th ed. 2018). Indeed, the concurrent representation of co-defendants is "fraught with the potential for chaos" and "should be avoided as the plague." *Ross v. State*, 268 Ind. 608, 611, 377 N.E.2d 634, 636 (1978). For example, codefendants may raise conflicting defenses, with one implicating the other. Or, in the plea bargaining process, one defendant may offer testimony against the other in exchange for a lesser charge or reduced sentence. LaFave, 3 Crim. Proc. § 11.9(a).

But conflicts of interest may threaten the effective assistance of counsel in other contexts as well. For example, a conflict may arise because of counsel's representation of a hostile witness, because of counsel's personal legal problems, or because of counsel's previous role as judge *pro tempore* in the same case. *See, respectively*, *Cowell v. State*, 275 Ind. 252, 254, 416

---

[12] The Court in *Strickland* referred to the *Cuyler* standard as a "limited" presumption of prejudice—not quite a *per se* rule of prejudice but a lesser standard than ordinary IAC claims. 466 U.S. at 692.

N.E.2d 839, 841 (1981); *Thompkins v. State*, 482 N.E.2d 710 (Ind. 1985); *Hennings v. State*, 638 N.E.2d 811 (Ind. Ct. App. 1994), *trans. denied*.

Not all conflicts of interest, however, present the same concerns. Unlike the high risk of harm imposed on at least one client in multiple-representation cases, a conflict implicating counsel's personal interests only (e.g., media rights or future referrals) need not compromise the duty of loyalty—that is, counsel may still act in the client's best interest even if detrimental to counsel's best interest. So, the question is whether a particular conflict-of-interest claim warrants application of the lower burden under *Cuyler* or the traditional prejudice standard under *Strickland*.

With the few exceptions noted above, Indiana Courts have long been reluctant to depart from traditional IAC analysis beyond multiple-representation conflicts. *See, e.g.*, *Johnson v. State*, 948 N.E.2d 331, 334 (Ind. 2011) (rejecting the conflict-of-interest exception to *Strickland* where there was no "other client or interest to which counsel owed a [conflicting] duty of loyalty"); *McGillem v. State*, 516 N.E.2d 1112, 1113 (Ind. Ct. App. 1987) (applying *Strickland* prejudice standard despite defendant's conflict-of-interest claim against trial counsel who also served as city attorney). This approach reflects the general view taken by the U.S. Supreme Court. *See Mickens v. Taylor*, 535 U.S. 162, 175–76 (2002) (questioning the propriety of extending the *Cuyler* standard beyond multiple-representation conflicts); *Holleman v. Cotton*, 301 F.3d 737, 742–43 (7th Cir. 2002) (stating that *Mickens* "has cast doubt" on whether *Cuyler* should even apply to successive-representation cases).

Without deciding whether *Cuyler* applies exclusively to multiple-representation conflicts, we hold that Gibson's conflict-of-interest claim

falls under our standard *Strickland* analysis for prejudice.[13] We reach this conclusion for several reasons.

First, Gibson's claim is essentially a repackaging of his IAC arguments above. Indeed, as evidence of counsel's alleged conflict, Gibson cites (1) the delay in assembling the investigative defense team, (2) the lack of preparation for jury selection, (3) the failure to consult with and adequately prepare qualified mental-health experts for mitigation at sentencing, and (4) the failure to consult with an expert to properly assess the reliability of Gibson's statements to police. If we were to apply the *Cuyler* standard to every case involving similar claims, the exception would effectively swallow the *Strickland* rule. *See Beets v. Scott*, 65 F.3d 1258, 1297 (5th Cir. 1995) (coming to the same conclusion).

Second, our conclusion follows precedent implicating similar claims. *See Brown v. State*, 698 N.E.2d 1132, 1145, 1145 n.17 (Ind. 1998) (applying *Strickland* standard rather than *Cuyler* standard in rejecting defendant's argument that insufficient resources from "the Lake County public defender system created a conflict of interest for her trial counsel"); *Johnson v. State*, 693 N.E.2d 941, 953 (Ind. 1998) ("Irrespective of whether there were problems with the public defender system, in order to claim ineffective assistance of counsel, [defendant] must show that his trial counsel provided deficient performance and that it was prejudicial.")

And, finally, regardless of the financial burden imposed on the county, trial counsel's undivided loyalty remained with Gibson. *See Henson v. State*, 798 N.E.2d 540, 543 n.3 (Ind. Ct. App. 2003) (noting that public defenders' "allegiance lies with the clients they represent," not with "the State or any employee of the State") (internal quotations omitted), *trans.*

---

[13] To be sure, our Rules of Professional Conduct prohibit a lawyer from representing a client if there's "a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to . . . a former client or a third person or by a personal interest of the lawyer." Ind. Professional Conduct Rule 1.7(a)(2). But while these rules offer general guidelines to avoid a potentially-broad range of conflicts, the "[b]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Mickens v. Taylor*, 535 U.S. 162, 176 (2002) (internal quotation marks omitted).

*denied*; *Wright v. State*, 436 N.E.2d 335, 338–40 (Ind. Ct. App. 1982) (noting the Sixth Amendment requires the state to "respect the independence of the public defender" and the code of professional responsibility requires attorneys to resist outside pressure, even from third parties who pay for the defendant's representation). *See also Wisehart*, 693 N.E.2d at 56–57 (holding that the alleged "lack of independence" attendant to "the political nature of appointments of public defenders" does not create a presumption of ineffective assistance based on a conflict of interest).

## B. There is no evidence that insufficient resources rendered trial counsel ineffective or resulted in prejudice to Gibson.

Applying the standard *Strickland* analysis to Gibson's claim, we find neither deficient performance nor prejudice.

The thrust of Gibson's argument is that trial counsel delayed the hiring of his defense team to qualify for reimbursement of expenses under Criminal Rule 24. That delay, he insists, resulted in a deficient mitigation strategy throughout the proceedings—from the pre-trial level to sentencing. But, as previously discussed, *see supra* section I.B., this contention contradicts the record, which shows that trial counsel and his defense team began work on the cases soon after their appointments. Additionally, we have consistently concluded throughout this opinion that counsel's performance met the prevailing professional norms.

And to the extent there was a delay, we find no prejudice to Gibson. Biggs testified that working toward compliance with Criminal Rule 24's caseload requirements had no effect on his ability to represent Gibson. Indeed, had the trial court concluded otherwise, it would have revoked Gibson's appointment as lead defense counsel. *See* Ind. Crim. Rule

24(B)(3)(d).[14] As for expenses, Biggs testified that "no one [had] ever questioned the cost" of defending Gibson and he never felt "pressure from anyone to save the county money when determining the needs of Mr. Gibson's defense." PCR Tr. Vol. I, p.45. Biggs repeated this chorus several times in his testimony, adding that no claim for reimbursement of expenses—totaling over $686,000—was ever denied or paid untimely.[15] While obligated not to squander public funds, Biggs considered himself "morally bound, ethically bound to spend whatever . . . is reasonable to spend in a capital case." PCR Tr. Vol. I, p.47. And in defending Gibson, he added, "[a]ll the money was spent because there was a need." *Id.*

To be sure, other members of the defense team offered conflicting testimony. Adams indicated that funding in Floyd County was generally "tight." PCR Tr. Vol. I, p.170. And Streib stated that "Biggs was worried about the public defender's office funding" and that he had a hard time getting paid on a "timely basis." PCR Tr. Vol. II, pp. 144, 148. But this conflict in testimony does not lead "unmistakably and unerringly" to a conclusion reached opposite that of the post-conviction court. *Ben-Yisrayl*, 738 N.E.2d at 258.

Based on the actual expenditures in representing Gibson and the employment of co-counsel, an investigator, a mitigation specialist, experts, and other consultants, we have little doubt that Gibson received quality

---

[14] In 2013, this Court amended Rule 24, not by prohibiting the appointment of a chief public defender to a capital case (as the Indiana Public Defender Commission had proposed) but rather by placing certain limits on these appointments. *See* Order Amending Indiana Rules of Criminal Procedure, No. 94S00-1301-MS-30 (Ind. May 29, 2013), *available at* https://www.in.gov/judiciary/files/order-rules-2013-94s00-1301-ms-30b.pdf. Under the revised rule, a court, before appointing a chief or managing public defender to represent a capital defendant, must assess the impact of the appointment on the workload of the attorney, including their administrative duties. *See id.* (codified at Ind. Crim. Rule 24(B)(3)(b)).

[15] For Gibson's capital case, Floyd County received reimbursement for 50% of expenditures from the Indiana Public Defender Commission. For Gibson's non-capital case, the county received 40%.

representation, not ineffective assistance of counsel prejudicial to his defense.

## Conclusion

For the reasons specified above, we affirm the post-conviction court's denial of relief in both *Gibson I* and *Gibson II*.[16]

Rush, C.J., and David and Goff, JJ., concur.
Slaughter, J., not participating.

---

[16] We decline to review Gibson's argument that trial counsel's deficiencies resulted in cumulative prejudice. An appellate court may assess whether the "prejudice accruing to the accused" from counsel's individual errors "has rendered the result unreliable, necessitating reversal under *Strickland*'s second prong." *Weisheit v. State*, 109 N.E.3d 978, 992 (Ind. 2018) (internal quotations omitted). But here, Gibson's arguments overlap to such an extent that a separate analysis on cumulative error would be superfluous. Indeed, the common thread running through most of his claims is that trial counsel's delay resulted in the inadequate development and presentation of mitigating evidence. And to the extent his remaining arguments break from this pervasive theory, we agree with the State that Gibson fails to "explain how one particular deficiency worked with another to create unique prejudice." State's GII Br. at 65.

ATTORNEY FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Deidre R. Eltzroth
Joanna L. Green
Steven Schutte
Lindsay C. Van Gorkom
Laura L. Volk
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Andrew A. Kobe
Kelly A. Loy
Denise A. Robinson
Deputy Attorneys General
Indianapolis, Indiana